# UNITED STATES $v.$ CLEVELAND INDIANS BASEBALL CO.

No. 00–203.   Argued February 27, 2001—Decided April 17, 2001

202

*James A. Feldman* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Underwood, former Solicitor General Waxman, Acting Assistant Attorney General Junghans, Deputy Solicitor General Wallace, Kent L. Jones, Kenneth L. Greene,* and *Robert W. Metzler.*

*Carter G. Phillips* argued the cause for respondent. With him on the brief were *Richard D. Bernstein, Stephen B. Kinnaird,* and *Anne Berleman Kearney.*\*

JUSTICE GINSBURG delivered the opinion of the Court.

The Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) impose excise taxes on employee wages to fund Social Security, Medicare, and unemployment compensation programs. This case concerns the application of FICA and FUTA taxes to payments of back wages. The Internal Revenue Service has consistently maintained that, for tax purposes, backpay awards should be attributed to the year the award is actually paid. Respondent Cleveland Indians Baseball Company (Company) urges, and the Court of Appeals for the Sixth Circuit held, that such awards must be allocated, as they are for purposes of Social Security benefits eligibility, to the periods in which the wages should have been paid. According due respect to the Service's reasonable, longstanding construction of the governing statutes and its own regulations, we hold that back wages are subject to FICA and FUTA taxes by reference to the year the wages are in fact paid.

I

Pursuant to a settlement of grievances asserted by the Major League Baseball Players Association concerning players' free agency rights, several Major League Baseball clubs agreed to pay $280 million to players with valid claims for salary damages. Under the agreement, the Company owed 8 players a total of $610,000 in salary damages for 1986, and it owed 14 players a total of $1,457,848 in salary damages for 1987. The Company paid the awards in 1994. No award recipient was a Company employee in that year.

---

\**Lawrence T. Perera* filed a brief for the Major League Baseball Players Association as *amicus curiae* urging affirmance.

This case concerns the proper FICA and FUTA tax treatment of the 1994 payments. Under FICA, both employees and employers must pay tax on wages to fund Social Security and Medicare; under FUTA, employers (but not employees) must pay tax on wages to fund unemployment benefits. For purposes of this litigation, the Government and the Company stipulated that the settlement payments awarded to the players qualify as "wages" within the meaning of FICA and FUTA. The question presented is whether those payments, characterized as back wages, should be taxed by reference to the year they were actually paid (1994), as the Government urges, or by reference to the years they should have been paid (1986 and 1987), as the Company and its supporting *amicus*, the Major League Baseball Players Association, contend.

In any given year, the amount of FICA and FUTA tax owed depends on two determinants. The first is the tax rate. 26 U. S. C. §§ 3101, 3111 (FICA), § 3301 (FUTA). The second is the statutory ceiling on taxable wages (also called the wage base), which limits the amount of annual wages subject to tax. § 3121(a)(1) (FICA), § 3306(b)(1) (FUTA). Both determinants have increased over time. In 1986, the Social Security tax on employees and employers was 5.7 percent on wages up to $42,000;[1] in 1987, it was 5.7 percent on wages up to $43,800;[2] and in 1994, 6.2 percent on wages up to $60,600.[3] Although the Medicare tax on employees and employers remained constant at 1.45 percent from 1986 to 1994,[4] the taxable wage base rose from $42,000 in 1986 to $43,800 in 1987,[5] and by 1994, Congress had abolished the

---

[1] 26 U. S. C. §§ 3101(a), 3111(a), 3121(a)(1); 51 Fed. Reg. 40256, 40257 (1986).

[2] §§ 3101(a), 3111(a), 3121(a)(1); 50 Fed. Reg. 45558, 45559 (1985).

[3] §§ 3101(a), 3111(a), 3121(a)(1); 58 Fed. Reg. 58004, 58005 (1993).

[4] §§ 3101(b), 3111(b).

[5] 26 U. S. C. § 3121(a)(1) (1982 ed.); 51 Fed. Reg. 40256, 40257 (1986); 50 Fed. Reg. 45558, 45559 (1985).

wage ceiling, thereby subjecting all wages to the Medicare tax.[6]   In 1986 and 1987, the FUTA tax was 6.0 percent on wages up to \$7,000;[7] in 1994, it was 6.2 percent on wages up to \$7,000.[8]

In this case, allocating the 1994 payments back to 1986 and 1987 works to the advantage of the Company and its former employees.  The reason is that all but one of the employees who received back wages in 1994 had already collected wages from the Company exceeding the taxable maximum in 1986 and 1987.  Because those employees as well as the Company paid the maximum amount of employment taxes chargeable in 1986 and 1987, allocating the 1994 payments back to those years would generate no additional FICA or FUTA tax liability.  By contrast, treating the back wages as taxable in 1994 would subject both the Company and its former employees to significant tax liability.  The Company paid none of the employees any other wages in 1994,[9] and FICA and FUTA taxes attributable to that year

---

[6] 26 U. S. C. § 3121(a)(1).

[7] 26 U. S. C. §§ 3301, 3306(b)(1) (1982 ed. and Supp. III).

[8] 26 U. S. C. §§ 3301, 3306(b)(1).

[9] If a player received wages in 1994 from another employer in addition to receiving back wages from the Company, the player—but not the Company—would be entitled to a credit or refund of any Social Security tax paid in excess of the amount of tax due on a single taxable wage base (\$60,600). 26 U. S. C. § 6413(c)(1).  To illustrate, suppose a player received \$50,000 in back wages from the Cleveland Indians and an additional \$50,000 in wages from the New York Mets in 1994.  Assuming all \$100,000 in wages are taxed in 1994, the player would be entitled to a credit or refund of Social Security tax paid in excess of the amount of tax due on \$60,600.  By contrast, the Indians and the Mets would *each* be liable for Social Security taxes on \$50,000 in wages paid to that player. 26 U. S. C. § 3111 (Social Security tax is "an excise tax, with respect to having individuals in his employ").  Thus, under the Government's proposed rule, the Cleveland Indians would owe Social Security taxes on all amounts up to \$60,600 that it paid to each player in 1994, regardless of whether the players themselves had reached or exceeded the \$60,600 ceiling through multiple wage sources.

would be calculated according to tax rates and wage bases higher than their levels in 1986 and 1987.

Uncertain about the proper rule of taxation, the Company paid its share of employment taxes on the back wages according to 1994 tax rates and wage bases. Its FICA payment totaled $99,382, and its FUTA payment totaled $1,008.[10] After the Internal Revenue Service denied its claims for a refund of those payments, the Company initiated this action in District Court, relying on *Bowman* v. *United States*, 824 F. 2d 528 (CA6 1987). In *Bowman*, the Sixth Circuit held that "[a] settlement for back wages should not be allocated to the period when the employer finally pays but 'should be allocated to the periods when the regular wages were not paid as usual.'" *Id.*, at 530 (quoting *Social Security Bd.* v. *Nierotko*, 327 U. S. 358, 370 (1946)). The District Court, bound by *Bowman*, entered judgment for the Company and ordered the Government to refund $97,202 in FICA and FUTA taxes.[11]

On appeal, the Government observed that two Courts of Appeals have held, in disagreement with *Bowman*, that under the law as implemented by Treasury Regulations, wages are to be taxed for FICA purposes in the year they are actually received. *Walker* v. *United States*, 202 F. 3d 1290, 1292–1293 (CA10 2000) (finding *Nierotko* "inapposite" and *Bowman* "unpersuasive"); *Hemelt* v. *United States*, 122 F. 3d 204, 210 (CA4 1997) (finding it "clear under the Treasury Regulations that 'wages' are to be taxed for FICA purposes in the year in which they are received"). The Court

---

[10] Although the Company also withheld $99,382 to pay the employees' share of FICA taxes, it does not seek to recover any taxes paid on behalf of the employees in this suit.

[11] This amount is slightly less than the total FICA and FUTA taxes paid by the Company in 1994. The reason is that one of the employees who received a 1994 payment for wages due in 1987 received no wages from the Company in 1987. The Company thus owed a small amount of FICA and FUTA taxes on the back wages paid to him even when those wages were allocated back to 1987.

of Appeals for the Sixth Circuit nevertheless affirmed on the authority of *Bowman.* 215 F. 3d 1325 (2000) (judgt. order).

We granted certiorari to resolve the conflict among the Courts of Appeals, 531 U. S. 943 (2000), and now reverse the Sixth Circuit's judgment.

## II

The Internal Revenue Code imposes employment taxes "on every employer . . . equal to [a percentage of] wages . . . paid by him with respect to employment." 26 U. S. C. §§ 3111(a), 3111(b), 3301. The Social Security tax provision, § 3111(a), contains a table prescribing tax rates applicable to "wages paid during" each year from 1984 onward (*e. g.,* "In cases of wages paid during . . . 1990 or thereafter . . . [t]he rate shall be . . . 6.2 percent."). The Medicare tax provision, § 3111(b)(6), says "with respect to wages paid after December 31, 1985, the rate shall be 1.45 percent." And the FUTA tax provision, 26 U. S. C. § 3301 (1994 ed., Supp. IV), says the rate shall be "6.2 percent in the case of calendar years 1988 through 2007 . . . of the total wages (as defined in section 3306(b)) paid by [the employer] during the calendar year."

Section 3121(a) of the Code establishes the annual ceiling on wages subject to Social Security tax. It does so by defining "wages" to exclude any remuneration "paid to [an] individual by [an] employer during [a] calendar year" that exceeds "remuneration . . . equal to the contribution and benefit base . . . paid to [such] individual by [such] employer during the calendar year with respect to which such contribution and benefit base is effective." Section 3306(b)(1) similarly limits annual wages subject to FUTA tax by excluding from "wages" any remuneration "paid to [an] individual by [an] employer during [a] calendar year" that exceeds "remuneration . . . equal to $7,000 . . . paid to [such] individual by [such] employer during [the] calendar year."

Both sides in this controversy have offered plausible interpretations of Congress' design. We set out next the parties' positions and explain why we ultimately defer to the Internal Revenue Service's reasonable, consistent, and long-standing interpretation of the FICA and FUTA provisions in point. Under that interpretation, wages must be taxed according to the year they are actually paid.

## A

In the Government's view, the text of the controlling FICA and FUTA tax provisions explicitly instructs that employment taxes shall be computed by applying the tax rate and wage base in effect when wages are actually paid. In particular, the Government calls attention to the statute's constant references to *wages paid during a calendar year* as the touchstone for determining the applicable tax rate and wage base. 26 U. S. C. § 3111(a) (setting Social Security tax rates for "wages paid during" particular calendar years); § 3121(a) (defining Social Security wage base in terms of "remuneration ... paid ... during the calendar year"); § 3301 (setting FUTA tax rate as a percentage of "wages . . . paid . . . during the calendar year"); § 3306(b)(1) (defining FUTA wage base in terms of "remuneration . . . paid . . . during any calendar year"). The meaning of this language, the Government contends, is plain: Wages are taxed according to the calendar year they are in fact paid, regardless of when they should have been paid.

In support of this reading, the Government observes that Congress chose the words in the current statute specifically to replace language in the original 1935 Social Security Act providing that FICA and FUTA tax rates applied to wages paid or received "with respect to *employment during the calendar year.*" Social Security Act (1935 Act), §§ 801, 804, 901, 49 Stat. 636–637, 639 (emphasis added). The Treasury Department had interpreted this 1935 language to mean that wages are taxed at "the rate in effect *at the time of the*

*performance of the services* for which the wages were paid." Treas. Regs. 91, Arts. 202, 302 (1936) (emphasis added). In 1939, Congress amended the 1935 Act to provide that FICA and FUTA tax rates would no longer apply on the basis of when services were performed, but would instead apply "with respect to *wages paid during the calendar yea[r]*." Social Security Act Amendments of 1939 (1939 Amendments), §§ 604, 608, 53 Stat. 1383, 1387 (emphasis added). This 1939 language remains essentially unchanged in the current FICA and FUTA tax provisions, 26 U. S. C. §§ 3111(a) and 3301.

Acknowledging that the 1939 Amendments established a "wages paid" rule for FICA and FUTA taxation, the Company nevertheless argues that *Social Security Bd.* v. *Nierotko,* 327 U. S. 358 (1946), undermines the Government's plain language argument. According due weight to our precedent, we agree.

In *Nierotko,* the National Labor Relations Board had ordered the reinstatement of a wrongfully discharged employee with "back pay" covering wages lost during the period from February 1937 to September 1939. *Id.,* at 359. The employer paid the award in July 1941. *Id.,* at 359–360. The primary question presented and aired in the Court's opinion was whether backpay for a time in which the employee was not on the job should nevertheless count as "wages" in determining the employee's eligibility for Social Security benefits. *Id.,* at 359. Notwithstanding the contrary view of the Social Security Board and the Bureau of Internal Revenue, the Court held that backpay covering the wrongful discharge period met the definition of "wages" in the 1935 Act. *Id.,* at 360–370.

In the final two paragraphs of the *Nierotko* opinion, the Court took up the question of how the backpay award should be allocated for purposes of determining the worker's eligibility for benefits. As originally enacted, the Social Security Act extended benefits to persons over 65 who had

earned at least $2,000 in wages in each of any five years after 1936. 1935 Act, §§ 201(a), 210(c), 49 Stat. 622, 625. In 1939, however, Congress introduced a new scheme, which remains in place today, tying eligibility for benefits to the number of calendar-year "quarters of coverage" accumulated by an individual. 1939 Amendments, §§ 209(g), (h), 53 Stat. 1376–1377 (codified at 42 U.'S. C. §§ 413(a)(2), 414). Section 209(g) defined a "quarter of coverage" as either "a calendar quarter in which the individual has been paid not less than $50 in wages" or any quarter except the first "where an individual has been paid in a calendar year $3,000 or more in wages." 53 Stat. 1377.

*Nierotko* swiftly dispatched the question whether "'back pay' must be allocated as wages . . . to the 'calendar quarters' of the year in which the money would have been earned, if the employee had not been wrongfully discharged." 327 U. S., at 370. Rejecting the Government's argument that such allocation was impermissible because the 1939 Amendments to the benefits scheme refer to "'wages' to be 'paid' in certain 'quarters,'" *id.*, at 370, and n. 25 (citing *id.*, at 362, n. 7 (citing § 209(g))), the Court concluded: "If, as we have held above, 'back pay' is to be treated as wages, we have no doubt that it should be allocated to the periods when the regular wages were not paid as usual." *Id.*, at 370.

Although the allocation question in *Nierotko* was a secondary issue addressed summarily by the Court, we think the Company is correct that *Nierotko* undercuts the plain meaning argument urged by the Government here. *Nierotko* found no conflict between an allocation-back rule for backpay and the language in § 209(g) tying benefits eligibility to the number of calendar quarters "in which" a minimum amount of "wages" "has been paid." The Court's allocation holding for benefits eligibility purposes, which the Government does not urge us to overrule, Tr. of Oral Arg. 9, thus turned on an implicit construction of § 209(g)'s terms—"wages" "paid" "in" "a calendar quarter"—to include "regular wages" that

should have been paid but "were not paid as usual," 327 U. S., at 370. Given this construction of § 209(g), now codified in 42 U. S. C. § 413(a)(2), we cannot say that the FICA and FUTA provisions prescribing tax rates based on *wages paid during a calendar year*, codified in 26 U. S. C. §§ 3111(a), 3301, have a plain meaning that precludes allocation of back-pay to the year it should have been paid. Cf. *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 205 (1991) (*"stare decisis* is most compelling" where "a pure question of statutory construction" is involved).

### B

From here, we part ways with the Company. Although we agree that *Nierotko* blocks the Government's argument that the "wages paid" formulation in 26 U. S. C. §§ 3111(a) and 3301 has a dispositively plain meaning, we reject the Company's next contention. Because *Nierotko* read the 1939 "wages paid" language for benefits eligibility purposes to accommodate an allocation-back rule for backpay, the Company urges, the identical 1939 "wages paid" language for tax purposes must be read the same way. We do not agree that the latter follows from the former like the night, the day.

*Nierotko* dealt specifically and only with Social Security benefits eligibility, not with taxation. The Court's allocation holding in *Nierotko* in all likelihood reflected concern that the benefits scheme created in 1939 would be disserved by allowing an employer's wrongdoing to reduce the quarters of coverage an employee would otherwise be entitled to claim toward eligibility. No similar concern underlies the tax provisions. Although Social Security taxes are used to pay for Social Security benefits in the aggregate, there is no direct relation between taxes and benefits at the level of an individual employee. As the Company itself acknowledges, "Social Security tax 'contributions,' unlike private pension contributions, do not create in the contributor a property right to benefits against the government, and wages rather

than [tax] contributions are the statutory basis for calculating an individual's benefits." Brief for Respondent 14.

*Nierotko* thus does not compel symmetrical construction of the "wages paid" language in the discrete taxation and benefits eligibility contexts. Although we generally presume that "identical words used in different parts of the same act are intended to have the same meaning," *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932), the presumption "is not rigid," and "the meaning [of the same words] well may vary to meet the purposes of the law," *ibid*. Cf. Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them . . . has all the tenacity of original sin and must constantly be guarded against."). The benefits scheme delineated in Title 42 would "no doubt" be set awry without an allocation-back rule for back wages, notwithstanding "accounting difficulties." *Nierotko*, 327 U. S., at 370. But that surely cannot be said for the taxation scheme described in Title 26, where Congress' evident concern was not worker eligibility for benefits, but fiscal administrability.[12]

---

[12] In determining that "accounting difficulties" were "not . . . insuperable" to its allocation holding, *Nierotko* noted that "'backpay' is now treated distributively" under § 119 of the Revenue Act of 1943. 327 U. S., at 370, and n. 26. Section 119 provided that backpay exceeding 15 percent of gross income may be allocated to earlier periods for income tax purposes if such allocation would reduce the taxpayer's liability. § 119(a), 58 Stat. 39. But Congress eliminated the 1943 backpay allocation rule in 1964, see Pub. L. 88–272, § 232(a), 78 Stat. 107, leaving behind the principle, "too firmly embedded in the income tax law to permit of any question," that "payments of compensation are income to a taxpayer on a cash basis in the year of receipt, as distinguished from the year in which the compensation is earned," 2 J. Mertens, Law of Federal Income Taxation § 12.42, p. 179 (1973). The symmetry urged by the Company in construing the tax and benefits provisions of FICA and FUTA thus comes only at the expense of asymmetry in the collection of income taxes and employment taxes.

The 1939 Amendments adopting the "wages paid" rule for taxation reflected Congress' worry that, as tax rates increase from year to year, "difficulties and confusion" would attend the taxation of wages payable in one year, but not actually paid until another year. S. Rep. No. 734, 76th Cong., 1st Sess., 75–76; see also H. R. Rep. No. 728, 76th Cong., 1st Sess., 57–58. Congress understood that an employee's annual compensation may be "based on a percentage of profits, or on future royalties, the amount of which cannot be determined until long after the close of the year." S. Rep. No. 734, 76th Cong., 1st Sess., at 75. Requiring employers to "estimate unascertained amounts and pay taxes and contributions on that basis" would "cause a burden on employers and administrative authorities alike." *Id.*, at 75–76. Congress correctly anticipated that "[t]he placing of [FICA and FUTA] tax[es] on the 'wages paid' basis [would] relieve this situation." *Id.*, at 76. "Under the amendment the rate applicable would be the rate in effect at the time that the wages are paid and received without reference to the rate which was in effect at the time the services were performed." H. R. Rep. No. 728, *supra*, at 58.

As an additional ground for construing the tax and benefits provisions *in pari materia*, the Company insists that Congress incorporated *Nierotko*'s treatment of backpay into the tax provisions when it amended the Social Security Act shortly after *Nierotko* was decided. Prior to 1946, the FICA and FUTA wage bases had been defined in terms of remuneration "paid ... with respect to employment during" a given year. 1935 Act, §811(a), 49 Stat. 639 (FICA); 1939 Amendments, §606, 53 Stat. 1383 (FUTA). Paralleling the 1939 Amendments to the tax rate provisions, Congress in 1946 established the current "wages paid" rule for identifying the wages that compose the FICA and FUTA wage bases in a given year. Social Security Act Amendments of 1946 (1946 Amendments), §§412, 414, 60 Stat. 989–991 (codified at 26 U. S. C. §§3121(a), 3306(b)(1)). The 1946 law amended

§ 209(a), which defines the Social Security wage base for purposes of benefits calculation, by adopting the "wages paid" language already present in § 209(g), the provision construed in *Nierotko*. § 414, 60 Stat. 990–991. Congress also used identical "wages paid" language in redefining the FICA and FUTA wage bases for tax purposes. § 412, 60 Stat. 989. Relying on the presumption that § 209(a), as amended, incorporated *Nierotko*'s construction of § 209(g), see *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–699 (1979), and observing that Congress redefined the wage bases for taxation to "confor[m] with the changes in section 209(a)," S. Rep. No. 1862, 79th Cong., 2d Sess., 36 (1946); H. R. Rep. No. 2447, 79th Cong., 2d Sess., 35 (1946), the Company urges that the amended benefits and tax provisions codified *Nierotko*'s backpay allocation rule.

We are unpersuaded. Even assuming that the benefits provision, § 209(a), is properly construed as incorporating *Nierotko*'s reading of § 209(g), we think the "confor[mity]" Congress sought to achieve between the tax and benefits provisions, S. Rep. No. 1862, *supra*, at 36; H. R. Rep. No. 2447, *supra*, at 35, had nothing to do with *Nierotko*'s treatment of backpay. The Committee Reports make clear that Congress' purpose in amending the FICA and FUTA wage bases was to define the "yardstick" for measuring "wages" as *"the amount paid during the calendar year . . . , without regard to the year in which the employment occurred."* S. Rep. No. 1862, *supra*, at 35 (emphasis added); H. R. Rep. No. 2447, *supra*, at 35 (emphasis added). It is with respect to this rule—measuring "wages" based on "the amount paid during the calendar year"—that Congress sought conformity between the Title 26 tax provisions and the Title 42 benefits provision. See S. Rep. No. 1862, *supra*, at 36 (tax wage base), 37 (benefits wage base); H. R. Rep. No. 2447, *supra*, at 35 (tax wage base), 36 (benefits wage base). Far from indicating an intent to codify *Nierotko*, those Reports suggest that Congress, if it considered

*Nierotko* at all, considered it an exception to the general rule for measuring "wages" in a given year.[13]  Because the concern that animates *Nierotko's* treatment of backpay in the benefits context has no relevance to the tax side, *supra*, at 212–213, it makes no sense to attribute to Congress a desire for conformity not only with respect to the general rule for measuring "wages," but also with respect to *Nierotko's* backpay exception.

### C

Were the Company to rely solely on arguments for symmetry in statutory construction, we would be inclined to conclude, given *Nierotko's* lack of concern with taxation, that the tax provisions themselves, informed by legislative purpose, require back wages to be taxed according to the year they are actually paid.  But the Company has one more arrow in its quiver.

Apart from its arguments for symmetry, the Company contends that the Government's refusal to allocate back wages to the year they should have been paid creates in-

---

[13] Indeed, the contemporaneous understanding of the Commissioner of Internal Revenue was that the 1946 Amendments supplanted *Nierotko's* allocation rule for backpay.  See Letter from Joseph D. Nunan, Jr., Commissioner of Internal Revenue, to Social Security Administration, Bureau of Old-Age and Survivors Insurance (Mar. 6, 1947) ("The *Nierotko* decision requiring your Agency to make an allocation of the back pay award to prior periods was rendered on the basis of the law in effect at that time. The Social Security Act Amendments of 1946, having been enacted subsequent to the date of the *Nierotko* decision, must be interpreted in the light of the language contained in such Amendments and the Congressional intent.") (available in Lodging for Respondent, Exh. F).  Nevertheless, for benefits eligibility and calculation purposes, the Social Security Administration (SSA) by regulation continues to apply the *Nierotko* rule to "[b]lack pay under a statute," 20 CFR § 404.1242(b) (2000) (such backpay "is allocated to the periods of time in which it should have been paid if the employer had not violated the statute"), while declining to apply *Nierotko* to "[b]lack pay not under a statute," § 404.1242(c) ("This back pay cannot be allocated to prior periods of time but must be reported by the employer for the period in which it is paid.").

equities in taxation and incentives for strategic behavior that Congress did not intend. This contention is not without force. Under the Government's rule, an employee who should have been paid $100,000 in 1986, but is instead paid $50,000 in 1986 and $50,000 in backpay in 1994, would owe more tax than if she had been paid the full $100,000 due in 1986. Conversely, a wrongdoing employer who should have paid an employee $50,000 in each of five years covered by a $250,000 backpay award would pay only one year's worth of employment taxes (limited by the annual ceilings on taxable wages) in the year the award is actually paid. The Government's rule thus appears to exempt some wages that should be taxed and to tax some wages that should be exempt.

Applying the Government's rule to other provisions of the Code produces similar anomalies. Section 3121(a)(4), for example, exempts disability benefits from FICA tax if paid by an employer to an employee more than six months after the employee worked for the employer. 26 U. S. C. § 3121(a)(4). Disability benefits included in a backpay award would be exempt from FICA tax if the employee had not worked for the employer for six months prior to the backpay award, even if the benefits should have been paid within six months after the employee stopped working for the employer. According to the Company, such results amount to tax windfalls and invite employers wrongfully to withhold pay or benefits in order to reap the advantages of a strategically timed payment. See Brief for Respondent 33–40 (additional examples of windfalls and avoidance schemes). These outcomes may be avoided, the Company argues, by construing the tax provisions to require taxation of back wages according to the year the wages should have been paid.

It is, of course, true that statutory construction "is a holistic endeavor" and that the meaning of a provision is "clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive

effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 371 (1988). The Company's examples leave little doubt that the Government's rule generates a degree of arbitrariness in the operation of the tax statutes. But in *Nierotko's* context, an inflexible rule allocating back-pay to the year it is actually paid would never work to the employee's advantage; it could inure *only* to the detriment of the employee, counter to the thrust of the benefits eligibility provisions.[14] In this case, by contrast, there is no comparable structural unfairness in taxation. The Government's rule sometimes disadvantages the taxpayer, as in this case. Other times it works to the disadvantage of the fisc, as the Company's examples show. The anomalous results to which the Company points must be considered in light of Congress' evident interest in reducing complexity and minimizing administrative confusion within the FICA and FUTA tax schemes. See *supra,* at 214. Given the practical administrability concerns that underpin the tax provisions, we cannot say that the Government's rule is incompatible with the statutory scheme. The most we can say is that Congress intended the tax provisions to be both efficiently administrable and fair, and that this case reveals the tension that sometimes exists when Congress seeks to meet those twin aims.

## D

Confronted with this tension, "we do not sit as a committee of revision to perfect the administration of the tax laws." *United States* v. *Correll,* 389 U. S. 299, 306–307 (1967). In-

---

[14] The SSA has interpreted its regulation governing "[b]ack pay under a statute," 20 CFR § 404.1242(b) (2000), to allow the employee to choose whether to allocate the backpay to the year it is paid or to the year it should have been paid. Social Security Administration, Reporting Back Pay and Special Wage Payments to the Social Security Administration 2, Pub. 957 (Sept. 1997).

stead, we defer to the Commissioner's regulations as long as they "implement the congressional mandate in some reasonable manner." *Id.*, at 307. "We do this because Congress has delegated to the [Commissioner], not to the courts, the task of prescribing all needful rules and regulations for the enforcement 'of the Internal Revenue Code." *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472, 477 (1979) (citing *Correll*, 389 U. S., at 307 (citing 26 U. S. C. § 7805(a))). This delegation "helps guarantee that the rules will be written by 'masters of the subject' . . . who will be responsible for putting the rules into effect." 440 U. S., at 477 (quoting *United States* v. *Moore*, 95 U. S. 760, 763 (1878)).

The Internal Revenue Service has long maintained regulations interpreting the FICA and FUTA tax provisions. In their current form, the regulations specify that the employer tax "attaches *at the time that the wages are paid* by the employer," 26 CFR § 31.3111–3 (2000) (emphasis added), and "is computed by applying to the wages paid by the employer the rate in effect *at the time such wages are paid*," § 31.3111–2(c) (emphasis added); see §§ 31.3301–2, –3(b) (same for FUTA). Echoing the language in 26 U. S. C. § 3111(a) (FICA tax) and § 3301 (FUTA tax), these regulations have continued unchanged in their basic substance since 1940. See T. D. 6516, 25 Fed. Reg. 13032 (1960); Treas. Regs. 107 (as amended by T. D. 5566, 1947–2 Cum. Bull. 148); Treas. Regs. 106 (as amended by T. D. 5566, 1947–2 Cum. Bull. 148); Treas. Regs. 106, §§ 402.301–.303, 402.401–.403 (1940). Cf. *National Muffler*, 440 U. S., at 477 ("A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.").

Although the regulations, like the statute, do not specifically address backpay, the Internal Revenue Service has consistently interpreted them to require taxation of back wages according to the year the wages are actually paid,

regardless of when those wages were earned or should have been paid. Rev. Rul. 89–35, 1989–1 Cum. Bull. 280; Rev. Rul. 78–336, 1978–2 Cum. Bull. 255. We need not decide whether the Revenue Rulings themselves are entitled to deference. In this case, the Rulings simply reflect the agency's longstanding interpretation of its own regulations. Because that interpretation is reasonable, it attracts substantial judicial deference. *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994). We do not resist according such deference in reviewing an agency's steady interpretation of its own 61-year-old regulation implementing a 62-year-old statute. "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Cottage Savings Assn.* v. *Commissioner,* 499 U. S. 554, 561 (1991) (citing *Correll,* 389 U. S., at 305–306).

\* \* \*

In line with the text and administrative history of the relevant taxation provisions, we hold that, for FICA and FUTA tax purposes, back wages should be attributed to the year in which they are actually paid. Accordingly, the judgment of the United States Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

If I believed that the text of the tax statutes addressed the issue before us, I might well find for the respondent, giving that text the same meaning the Court found it to have in the benefits provisions of the Social Security Act. See *Social Security Bd.* v. *Nierotko,* 327 U. S. 358, 370, and n. 25 (1946). The Court's principal reason for assigning the identical language a different meaning in the present case—

leaving aside statements in testimony and Committee Reports that I have no reason to believe Congress was aware of—is that tax assessments do not present the equitable considerations implicated by the potential arbitrary decrease of benefits in *Nierotko*. See *ante*, at 212–213. But the Court acknowledges that departing from *Nierotko* will produce arbitrary variations in tax liability. See *ante*, at 216–218. As between an immediate arbitrary increase in tax liability and a deferred arbitrary decrease in benefits, I cannot say the latter is the greater inequity. The difference is at least not so stark as to cause me to regard the two regulatory schemes as different in kind, which I would insist upon before giving different meanings to identical statutory texts.

In fact, however, I do not think that the text of the FICA and FUTA provisions, 26 U. S. C. §§ 3111(a), 3111(b), 3301, addresses the issue we face today. Those provisions, which direct that taxes shall be assessed against "wages paid" during the calendar year, would be controlling if the income we had before us were "wages" within the normal meaning of that term; but it is not. The question we face is whether *damages awards compensating an employee for lost wages* should be regarded for tax purposes as wages paid when the award is received, or rather as wages paid when they would have been paid but for the employer's unlawful actions. (The parties have stipulated that the damages awards should be regarded as taxable "wages paid" of some sort, see also *Social Security Bd.* v. *Nierotko, supra*, at 364–370.) The proper treatment of such damages awards is an issue the statute does not address, and hence it is an issue left to the reasonable resolution of the administering agency, here the Internal Revenue Service. In *Nierotko*, which we decided at a time when it was common for courts to fill statutory gaps that would now be left to the agency, we provided one rule for purposes of the benefits provisions. The Internal Revenue Service has since provided another

rule for purposes of the tax provisions. Both rules are reasonable; neither is compelled; and neither involves a direct application of the statutory term "wages paid" which would require (or at least strongly suggest) a uniform result. I therefore concur in the Court's judgment deferring to the Government's regulations.