**HARRISON SILVERGROVE PROPERTY, LLC, a/k/a Harrison Silvergrove, LLC; and Carlisle & Bray Enterprises, LLC, a/k/a Carlisle & Bray Enterprises, Appellants**

v.

**CAMPBELL COUNTY AND MUNICIPAL BOARD OF ADJUSTMENT, Appellee**

NO. 2014–CA–000619–MR

Court of Appeals of Kentucky.

RENDERED: JULY 8, 2016; 10:00 A.M.

Briefs for Appellants: Thomas W. Breidenstein, Covington, Kentucky

Brief for Appellee: Thomas R. Nienaber, Dale T. Wilson, Florence, Kentucky

BEFORE: ACREE, D. LAMBERT, AND MAZE, JUDGES.

## OPINION

ACREE, JUDGE:

Appellants Harrison Silvergrove Property, LLC a/k/a Harrison Silvergrove, LLC and Carlisle & Bray Enterprises, LLC a/k/a Carlisle & Bray Enterprises (collectively, C&B [1]) appeal from a Campbell Circuit Court order affirming the Appellee Campbell County and Municipal Board of Adjustment's (Board) denial of C&B's ap-

plication for a conditional-use permit. We affirm.

## I. *Facts and Procedure*

Harrison Silvergrove owns real property situated in Campbell County, Kentucky. The property benefits from substantial waterfront and is zoned River Recreation/Conservation (R/CO) under Article X, Section 10.0 of the Zoning Ordinance of the City of Melbourne. C&B is a full-service marine company engaged in the transport by river barge and boat of goods for businesses in the Midwest.

On November 20, 2012, C&B filed an application with the Board seeking a conditional use permit to allow a "dockage facility" on the property. The application described the uses on the property to be "a boat dockage and transfer of goods facility" which "would include fueling, service and repair, sale of boat supplies and grocery supplies." The Board's professional planning staff recommended approval of the application subject to certain conditions.

The Board conducted a lengthy evidentiary hearing. C&B testified through its representative, Bob Weis. Weis stated the purpose of the application was to bring the zoning of the property in line with its use over the past 20 years. He testified the dockage facility would primarily be used as a transfer point for employees: the employees would board a small boat there, which would transport them to C&B's main fleet down the river.

In addition to C&B, nine of its neighbors testified and urged the Board to deny C&B's application. They described "heavy industrial" activity occurring on the site, starkly dissimilar to that proposed by

---

1. For convenience, we refer to these parties jointly as "C&B". Where the context requires, we will differentiate between the two.

C&B. Robert Bathalter, attorney on behalf of some of the neighbors, submitted a memorandum succinctly describing the offensive activity:

1. Parking barges at the marina and in front of the property of other residents.
2. Cleaning the barges which, among other things, includes using compressed air to blow out coal dust from the barges.
3. Transporting the barges too close to the shore in violation of various regulations which causes erosion of the banks.
4. Moving in heavy equipment to separate oil and water.
5. Working all night with very bright lights and loud noise which disturbs the neighbors.
6. Bringing in tractor trailers which cannot navigate the streets and which are loaded with heavy equipment.
7. Bringing in employees who speed on the residential streets.

The neighbors claimed to be subjected to bright lights, strident noise, and vibrations at all hours which disturbs their peace and wakes them at night. They have also observed coal dust sprayed into the air during barge cleaning; barges docked in front of their homes, blocking their views of the river; welding on barges; odors and fumes emanating from the barges; semi-trucks struggling to negotiate the narrow roads and tearing up yards; and an increase in traffic and speeding drivers, compromising the safety of the other travelers on the adjoining roads. The neighbors submitted photographic evidence substantiating many of their allegations.

As to the accuracy of the property's historical use, the neighbors submitted that the land had not been used for the past twenty years in the manner currently claimed by C&B. The testimony was that, throughout the 1990s, George Harrison operated a marina, which consisted of a boat harbor, loading ramp, and restaurant, pursuant to a duly-issued permit. The marina closed shortly after George's death and, for a period thereafter, George's son docked a tow boat at the site. It was not until very recently that C&B began heavy-industrial operations at the marina, altering its entire character.

Two neighbors testified that they twice complained to the Army Corps of Engineers about C&B activities, first in August 2012 and again in February 2013. The Corps "shut down" C&B and ordered it to remove its heavy equipment and other items located at the site, except for the dilapidated tug boat mentioned earlier in this opinion. C&B initially complied, but when the need arose would bring back the equipment. Neighbor Howard Baber questioned whether "dockage facilities" as used in the Section 10.0 of the zoning ordinance encompassed private commercial operations. He thought dockage facilities contextually meant for the people using the harbor, not for a commercial purpose.

C&B was given an opportunity to respond to the neighbors' comments. The Board then asked if any party had any other remarks to make. Hearing none, the Board closed the public-comment portion of the meeting, and openly debated C&B's application in full public view. The Board questioned whether the activity occurring on the site—docking and cleaning barges, welding, and barge maintenance and repairs—is the type of "dockage facility" envisioned in an R/CO zone. While "dockage facility" is a recognized conditional use, the ordinance does not define that term.

In a letter dated March 20, 2013, the Board denied C&B's application. That letter explained:

The activity occurring on the site and requested for approval as a conditional use is not a "dockage facility" per the City of Melbourne Zoning Ordinance

River Recreation/Conservation (R/CO) Zone. It is our interpretation that the dockage facility listed in the R/CO Zone is one for recreational use, not heavy industrial use. The applicant's [proposed] use is a heavy industrial type of dockage facility which is not consistent with the intent of this R/CO Zone. Further, the activity does not meet any of the activities listed as permitted, accessory or conditional uses with the R/CO Zone.

C&B appealed the denial to the circuit court, which concluded the Board's decision was not arbitrary because the Board did not exceed its statutory authority or violate C&B procedural due process rights, and its decision was supported by the evidence. C&B then appealed to this Court

## II. *Analysis*

■ Judicial review of a zoning decision is focused exclusively on whether the agency's decision was arbitrary. *Hilltop Basic Res., Inc. v. County of Boone*, 180 S.W.3d 464, 467 (Ky.2005). Arbitrariness review is limited to three considerations: "(1) whether the agency exceeded its statutory authority; (2) whether the parties were afforded procedural due process; and (3) whether the agency decision was supported by substantial evidence." *Keogh v. Woodford County Bd. of Adjustments*, 243 S.W.3d 369, 372 (Ky.App.2007); *Hilltop Basic Res.*, 180 S.W.3d at 467. C&B attacks the circuit court's order and, in turn, the Board's decision on all three fronts.

### A. *The Board did not exceed its statutory authority*

■ C&B argues that the Board exceeded its statutory authority by interpreting Article X, Section 10.0 of the Melbourne Zoning Ordinance to limit "dockage facility" in the R/CO zone to "recreational" dockage facilities, and the circuit court erred in affirming the Board's decision.

■ Whether a public agency exceeded its statutory authority is a question of law subject to *de novo* review. *Keogh,* 243 S.W.3d at 372; *Cincinnati Bell Tel. Co. v. Kentucky Pub. Serv. Comm'n,* 223 S.W.3d 829, 836 (Ky.App.2007).

A board of adjustment is an official body designated to hear and decide applications for variances from the terms of a zoning ordinance. *See* KRS 100.237. It is vested with "the power to hear and decide applications for conditional use permits to allow the proper integration into the community of uses which are specifically named in the zoning regulations which may be suitable only in specific locations in the zone only if certain conditions are met." *Id.* "The board may approve, modify, or deny any application for a conditional use permit." KRS 100.237(1).

Article X of the Melbourne Zoning Ordinance states, in pertinent part:

**Section 10.0 River Recreation/Conservation (R/CO Zone):**

A. USES PERMITTED:

  1. Agricultural uses;

  2. Publicly owned and/or operated parks and/or recreation areas;

  3. Private recreational uses other than those publicly owned and/or operated such as golf courses, country clubs, and camping areas;

. . .

C. CONDITIONAL USES

  1. Riding academies and stables;

  2. The following uses are permitted in connection with streams, rivers, lakes, or other bodies of water . . .

    a. Boat harbors and marines; The following uses shall be permitted as accessory uses in connection with any boat harbor or marina and primarily intended to serve only persons using the boat harbor or marina:

(1) Boat fueling, service, and repairs;

(2) Sale of boat supplies;

(3) Grocery store;

(4) Restaurant;

(5) Club house and lockers, if afloat;

(6) Single-family dwelling units including cabins.

b. Public boat landing and launching facilities;

c. Dockage facilities;·

d. Off-street parking facilities and temporary parking of boat trailers including spaces large enough to accommodate automobiles pulling boats.

C&B argues that it submitted an application for a dockage facility, just as expressly and specifically permitted by Section 10.0 as a conditional use in an R/CO zone. And the language of that article does not differentiate between "recreational" dockage facilities and "industrial" dockage facilities. However, so goes the argument, the Board's *ad hoc* revision limits the conditional use to a "recreational" dockage facility only. Such grafting onto the ordinance, argues C&B, is arbitrary and capricious.

■ We think it entirely within the statutory authority of a board of adjustment to interpret and define conditional uses and terms contained within a zoning ordinance that lack a delineated definition as part and parcel of its decision whether to grant a conditional use in a particular zone. Bluntly stated, a board of adjustments is vested with limited interpretive authority. See *Keogh*, 243 S.W.3d at 372 (the board of adjustments did not exceed its authority when it accepted the planning director's definition of a tourist home where the zoning ordinance provided no definition). It must do so, however, within the framework of the ordinance. *Id.* (the planning director had the authority to interpret the zoning ordinance within the framework of the ordinance).

■ In interpreting a particular ordinance, a board of adjustment must not view sections of it in a vacuum, but instead consider the ordinance as a whole. *Id.* at 373 ("Various sections of a[n] ... ordinance are not to be considered as isolated fragments of the law, but part of the whole unless a different purpose is clearly shown." (citation omitted)). That is what the Board did in this case. Within the framework of the Article X, the Board concluded that "dockage facilities" as a conditional use in Section 10.0 did not include heavy-industrial activities. The Board began by examining all of Section 10.0. It found persuasive the fact that all the authorized conditional uses in Section 10.0 refer solely to recreational activities, thus keeping with the intent of the zone to limit activities to recreation and conservation. The Board derived this intent from the title of the zone and the specific uses permitted. We agree with C&B that section headings or titles are not meant to displace the text of an ordinance. The words of the section speak for themselves. And while the section's title heading is not binding, it can hardly be said to carry no persuasive weight.

Expanding its view, the Board also considered the zoning ordinance as a whole. Equally persuasive is that the ordinance specifically authorizes "barge, shipping, and docking facilities" in industrial river zones I–4 (Section 10.26) and 1–5 (Section 10.27), but *only* "dockage facilities" in R/CO zones. "A conditional use is one that is suitable to a zoning district, but not necessarily to every location within that district." Black's Law Dictionary (10th ed. 2014); KRS 100.111(6) (defining "conditional use"). The Board thought it contrary to the ordinance to permit heavy-

industrial docking facilities in a zone that, by its own terms, limits itself in every respect to recreation and conservation activity. The docking facility C&B argues is permissible would be more appropriate in an industrial river zone. Furthermore, while R/CO zone authorizes dockage facilities as a conditional use, it does not permit shipping and barges.

■ C&B points out that Sections 10.0 and 10.26 use nearly identical terms—"dockage facilities" in the R/CO zone and "docking facilities" in the I–4 industrial river zone. C&B argues that under normal rules of statutory construction the same words used in different parts of the same piece of legislation are intended to have the same meaning. "Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning [of the same words] well may vary to meet the purposes of the law." *Woods v. Commonwealth,* 142 S.W.3d 24, 41 (Ky.2004) (quoting *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 213, 121 S.Ct. 1433, 1441, 149 L.Ed.2d 401 (2001)). In any event, Section 10.0 uses the term "dockage facilities" while Section 10.26 references "docking facilities" in conjunction with the terms "barge" and "shipping." This distinction is meaningful.

C&B asserts the Board's decision offends Kentucky's long-standing rule that "[z]oning resolutions are in derogation of the common law and deprive a property owner of certain uses of his land, and as such, must be strictly construed." *Hammer v. Best,* 656 S.W.2d 253, 255 (Ky.App. 1983). By cobbling the word "recreational" onto "dockage facilities," so the argument goes, the Board failed to strictly construe the conditional use in favor of the free use of the property.

■ We agree generally with C&B that zoning ordinances must be strictly construed. *See id.* But that tenet must function in harmony with the stated purpose of the Board—to provide an element of flexibility in zoning administration to ensure substantial justice is done. "At a minimum, a zoning ordinance must contain a plan for orderly growth, 'and property owners must be able to rely on it when making investments in real estate and for the protection of land values.' " *Keogh,* 243 S.W.3d at 372 (citation omitted). C&B's property is not the only land at issue here. The Board must also be mindful of how C&B's proposed plan affects its neighbors. Surrounding property owners rely on the predictability of zoning ordinances as much as the applicant seeking a conditional use.

Finally, C&B complains that the Board abandoned the very process contemplated in KRS 100.237 to ameliorate any impairment to the integrity or character of the zone by allowing the proposal, but placing conditions on the use. The Board was certainly mindful that it could grant C&B's application with restrictions. It discussed that option during its meeting. We reject C&B's argument that the circuit court and Board distorted the authorized conditional use and the directive for ameliorating the use in the zone. The Board was under no compulsion to allow the conditional use subject to restrictions. KRS 100.237(1) ("board *may* approve, modify, or deny any application for a conditional use permit" (emphasis added)).

In sum, we do not believe the board of adjustments abused its authority by its interpretation of the undefined text of the particular section and the ordinance as a whole. We are not persuaded by C&B's argument on this ground.

### B. C&B was afforded all procedural process due

■ C&B next argues that the Board denied it procedural due process by: (a)

conducting a zoning appeal instead of a conditional use application hearing which had been requested and advertised; and (b) failing to re-open the public comment section of the hearing. C&B failed to convince the circuit court that it was deprived of due process. We agree with the circuit court.

C&B contends the Board, in its deliberations and decision, effectively converted this hearing from one for a conditional use permit into a statutory administrative appeal under KRS 100.257. That statute reads:

> The board of adjustment shall have the power to hear and decide cases where it is alleged by an applicant that there is error in any order, requirement, decision, grant, or refusal made by an administrative official in the enforcement of the zoning regulation. Such appeal shall be taken within thirty (30) days.

C&B claims the Board was consumed with discussion over the issue of interpretation, which converted the nature of the entire proceeding. It also asserts the Board *sua sponte* decided to overturn the staff's recommendation—without a formal request and without giving C&B an opportunity to respond. C&B's argument lacks merit and is inadequately rooted in law or fact.

The Board's discussion of the need to interpret Article X of the zoning ordinance did not convert the hearing in the manner claimed by C&B. That discussion was attendant to, and a necessary component of, the decision to grant or deny C&B's conditional use permit application. We agree entirely with the circuit court that discussions such as this are inherent in the Board's decision-making process. From a more fundamental standpoint, no staff "order, requirement, decision, grant, or refusal" was being appealed to the Board. We are at a loss to understand C&B's claim that this hearing was in fact one under KRS 100.257.

C&B frequently criticizes the Board's decision not to follow the recommendations of its professional planning staff. But the staff's recommendations are just that: *recommendations. See generally* KRS 100.223 ("Any board of adjustments may employ or contract with planners or other persons as it deems necessary to accomplish *its assigned duties* under this chapter." (emphasis added)). C&B cites to no authority that would compel the Board to follow the suggestions of its staff. A rule to the contrary would strip the Board of its powers and purpose, making it a mere rubber stamp for the planners. That is not the purpose of a board of adjustment.

This brings us to C&B's second due-process claim. It asserts the Board failed to afford it sufficient opportunity to weigh in when "the Board suddenly and without notice redefined the conditional use" during its deliberations. C&B argues that if it had had advance notice or been given notice at the conclusion of the public-comment portion of the hearing, it could have contested the legal analysis or otherwise addressed the Board's conclusion.

The hallmark of procedural due process is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Hilltop Basic Res.*, 180 S.W.3d at 468 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). That is, notice and an opportunity to be heard. *Dep't of Revenue, Fin. & Admin. Cabinet v. Wade*, 379 S.W.3d 134, 138 (Ky.2012) (these are the "essential requirements" of due process). C&B, through its representative, meaningfully participated in the three-hour hearing before the Board. It commented on its application, offered a historical accounting of the site, depicted its vision of the dockage facility, and responded to questions. C&B does not deny being afforded this opportunity nor does it deny taking advantage of

it. Instead, it stands on a claimed entitlement to address the Board's thought process that formed and revealed itself during the deliberation phase. However, C&B never asked for that opportunity. At no point did it ask to re-open the hearing or to add additional commentary when the Board—to use C&B's words—"suddenly" shifted the issue by "grafting" recreational onto "dockage facility" under Article X of the local zoning ordinance. Nothing prevented it from seeking that additional input, although nothing guaranteed the right to present it.

To the extent C&B requests advance notice of all opposition to its application prior to the hearing, it puts the proverbial horse before the cart. We think it inconceivable to require the Board to advise an applicant of its possible outcome and thought-process prior to the public hearing. Until hearing all the evidence, the Board should have been unaware which way it intended to rule. That is, the hearing shaped the Board's deliberations. It is true that in other contexts, such as in a criminal proceeding, a party would be entitled to prior notice of certain kinds of evidence. *See, e.g.,* Kentucky Rules of Evidence (KRE) 404(c). However, there is no such requirement in administrative hearings of this kind.

Furthermore, the issue of whether the intended use was a "dockage facility" as that term is used in the R/CO zone was first introduced by neighbor Howard Baber during the public-comment portion of the hearing. C&B could have offered its interpretation as part of its response. It chose not to.

We are convinced C&B received at least the process to which it was due and entitled. Again, we are not persuaded by this argument.

## C. The Record Does Not Compel a Result Contrary to that Found by the Board

Finally, C&B argues the circuit court erred in concluding that substantial evidence in the record supported the denial of the requested conditional-use permit when there was no evidence or testimony in the record upon which the Board could have reached its decision. In other words, the Board's decision was arbitrary because it lacked supporting evidence. While framed as a "substantial evidence" argument, we view it from a slightly different perspective. C&B, the party saddled with the burden of proof, was denied the relief it sought at the administrative level. In such a case, "the failure to grant administrative relief to one carrying the burden is arbitrary [only] if the record compels a contrary decision in light of substantial evidence therein." *Bourbon County Bd. of Adjustment v. Currans,* 873 S.W.2d 836, 838 (Ky.App. 1994).

> Not infrequently, contestants appear at the judicial level arguing that the administrative decision is not supported by substantial evidence when the board has offered no relief in the first instance. In other words, the board has ruled that the one having the burden of proof— usually the applicant—has failed. In such cases, attention should be directed to the administrative record in search of compelling evidence demonstrating that the denial of the relief sought was arbitrary. The argument should be that the record compels relief. The argument that there is no substantial evidence to support nonrelief is an anomaly.

*Id.* Evidence is compelling if it is so overwhelming that no reasonable person could fail to reach the same conclusion. *Greene v. Paschall Truck Lines,* 239 S.W.3d 94, 108 (Ky.App.2007) (citation omitted).

C&B argues the Board distorted the record to "redefine" the conditional use permitted in the R/CO zone and there is no evidence or testimony in the record about the revised and reconstituted conditional use. It appears C&B is rebranding its prior arguments under the substantial-evidence heading. We have already found the Board's interpretation of "dockage facility," as that term is used in Section 10.0, to be legally sound. We need not re-visit that issue. In light of that definition and under the evidence as a whole, we are not convinced the record compels a different result. The great weight of the evidence was that C&B was conducting heavy-industrial activities that have no place in a recreation and conservation zone and that were to the substantial detriment of C&B's neighbors. C&B has identified no compelling evidence demonstrating that the denial of its conditional use permit was arbitrary.

### III. *Conclusion*

We agree with the Campbell Circuit Court's March 20, 2014 order affirming the Campbell County and Municipal Board of Adjustment's decision to deny C&B's request for a conditional-use permit. In all respects, we affirm.

ALL CONCUR.