NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–128C.

United States Court of Federal Claims.

Dec. 20, 2002.

Gregory O'Duden, Washington, D.C., for plaintiffs. Barbara A. Atkin and Robert H. Shriver, III, of counsel.

Judry L. Subar, U.S. Department of Justice, Washington, DC, with whom were Rob-

ert D. McCallum, Jr., Assistant Attorney General, and Director David M. Cohen, for defendant. Susan K. Rudy, John R. Tyler, and Susan Demske, of counsel.

## ORDER APPROVING SETTLEMENT OF CLASS ACTION

FIRESTONE, Judge.

This matter comes before the court on the parties' joint motion for final approval of the settlement agreement between the United States and the National Treasury Employees Union ("NTEU"). The court gave preliminary approval to the settlement agreement on June 17, 2002, and a fairness hearing was conducted on November 18, 2002. For the reasons stated below, the settlement of the class action is **APPROVED**.[1]

## I. BACKGROUND

### A. Summary of the Litigation and Negotiations

This settlement ends nearly twenty years of litigation which stemmed from NTEU's ("plaintiffs") 1983 challenge to a regulation promulgated by the United States Office of Personnel Management ("OPM") in 1982 that governed how pay increases were to be calculated for federal employees receiving "special salary rates." "Special rate" employees are subject to a different pay scale from general schedule employees, on the ground that greater pay is required in order to attract and retain these employees.[2]

---

1. This court order also serves to **GRANT** the following motions: (1) Joint Proposal of Lester J. Levy, Esq. to serve as Settlement Adjudicator, filed May 21, 2002: *infra* p. 795; and (2) Joint Proposal of a Detailed Plan for Providing the Court with Regular Reports from the Trustee, filed May 21, 2002: *infra* p. 805 n. 5. The court also approves of class counsel's proposal that the Federal Employee Education and Assistance Fund ("FEEA") shall be the recipient of a small donation. *Infra* p. 805.

2. The United States Court of Appeals for the Federal Circuit explained "special rate employees" in the following way:

Most civilian, white collar federal employees are paid in accordance with the statutory pay rates of the General Schedule (GS) which apply uniformly on a nationwide basis. When

the President finds that pay rates in private enterprise are substantially above the GS rates and significantly handicap the government's recruitment or retention of well-qualified employees, he may, under 5 U.S.C. § 5303, set higher rates of pay for such employees. They are termed special rate employees. Under 5 U.S.C. § 5305(a)(2) the President must annually "adjust the rates of pay of each statutory pay system in accordance with the principles under section 5301(a)" which in part provides that federal pay rates should be comparable with private enterprise pay rates for the same levels of work. If the President considers it inappropriate to make the pay adjustments prescribed by section 5305(a) because of national emergency or economic conditions, he may submit an "alternative plan with respect to a pay adjustment." 5 U.S.C. § 5305(c)(1).

Under the challenged 1982 regulation, OPM determined that special rate employee salaries would no longer be reviewed whenever pay increases were granted to federal employees covered by the general schedule. Instead, special rate salaries would be reviewed without regard to any general schedule raise. As a result, many special rate employees received little or no pay increases during the years the OPM regulation was in effect, while their colleagues paid under the general schedule received pay increases almost every year. In 1989, the district court granted plaintiffs' motion for class certification. The class has approximately 210,000 members.

The case was heard by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") on two occasions. In the first decision, the Federal Circuit affirmed the district court's holding that OPM's 1982 regulation was invalid but vacated the district court's judgment insofar as it prescribed a conversion rule. *NTEU v. Horner,* 869 F.2d 571 (Fed.Cir.1989). The Federal Circuit then remanded the case to the district court with instruction to the court to allow OPM to promulgate appropriate conversion rules. *Id.*

On remand, the district court approved a new OPM rule that it ruled should be applied retroactively to determine back pay. As applied, the new OPM rule would have resulted in a negligible number of class members receiving small amounts of back pay, with virtually all receiving nothing. *NTEU v. King,* No. 83–0279 (D.D.C., May 8, 1995). Plaintiffs appealed the district court's approval of the new OPM rule and its retroactive application to determine back pay. The Federal Circuit upheld the new OPM rule, but agreed with plaintiffs that, at a minimum, class members were entitled to back pay under OPM's pre–1982 rule. *NTEU v. King,* 132 F.3d 736 (Fed.Cir.1998), *affirming in part, reversing in part, and remanding* No.

83–0279 (D.D.C. May 8, 1995). Specifically, the Federal Circuit held:

> [W]e conclude that OPM's proposed rule is a proper implementation of section 5303(d) because it is not arbitrary, capricious, or manifestly contrary to the statute .... The pre–1982 rule, despite its mechanical nature, did ensure that special rate employees would not enjoy duplicative pay raises because it accounted for pay adjustments given to special rate employees in prior years .... Because we hold that the pre–1982 regulation was valid, it is the proper measure of damages for plaintiffs.

*Id.* at 741. The Federal Circuit then remanded the case to the district court once again for a determination of plaintiffs' damages under the pre–1982 OPM rule.

Upon remand, the parties embarked on a four-year settlement negotiation process under the auspices of the United States District Court for the District of Columbia's mediation program. In early January 2002, the parties reached a settlement and realized that by virtue of the formula established under the settlement and the factual circumstances of certain class members, the case had to be transferred to the United States Court of Federal Claims for settlement approval.[3] The case was transferred to this court on February 15, 2002.

### B. Summary of the Major Terms of the Settlement

The terms of the settlement are summarized as follows:

#### 1. The Lump Sum Payment

The government has agreed to make a lump sum payment of $173,510,566.02 in trust to the class. *See* Sett. Agr. ¶ III.A.1. In addition, because this court's final approval was not obtained by August 31, 2002, the settlement provides that this amount will be supplemented pursuant to an agreed-upon

---

*NTEU v. Horner,* 869 F.2d 571, 572 (Fed.Cir. 1989).

**3.** The Tucker Act dictates that the Court of Federal Claims shall have jurisdiction over claims against the federal government which seek monetary relief in excess of $10,000.00. *See* 28

U.S.C. § 1346(a)(2) (2002). Because of the length of time at issue, some class members are entitled to back pay in excess of $10,000.00; this court, therefore, has exclusive jurisdiction over this case.

formula that will yield additional dollars of interest. *See id.* at ¶ III.A.2.

## 2. The Remedial Methodology

Calculation of the amounts due individual class members is to be set by applying the remedial methodology developed by the parties. *See* Sett. Agr., Att. 1. Under the methodology, class members will receive back pay for lost salary and premium pay, as well as interest on those amounts. In addition, those class members owed back pay in any of the last three years before they retired from the federal government will receive an additional lump sum retirement benefit.

The lost salary amount is calculated through retroactive application of the Federal Circuit-endorsed pre–1982 OPM alignment rule. However, because of the number of class members involved, their locations around the world, and the lack of complete personnel files going back nearly 20 years, the parties found it necessary to adopt a few simplifying rules and assumptions to allow for the computations to be completed with reasonable accuracy, and in a reasonable amount of time. *See id.* at 3–17.

The lost premium pay component consists of an additional three percent of the lost salary owed the class member. *See id.* at 17–18. Three percent is somewhat higher than the average amount of premium pay received by general schedule federal employees during the years covered by the lawsuit.

Interest is calculated using the rates applicable under the Back Pay Act, 5 U.S.C. § 5596. *See* Sett. Agr., Att. 1 at 22; Sett. Dist. Plan § X. Interest begins to accrue as of the midpoint of the first payment period for which a class member is owed back pay and, for those who file timely claims for their money, runs up to within thirty days of payment. *See* Sett. Agr., Att. 1 at 22; Sett. Dist. Plan § X.

The retirement payment is calculated by determining the impact of back pay on the class member's last three years of salary and then multiplying that figure by an annuity

correction factor ("ACF"). *See* Sett. Agr., Att. 1 at 18–22. The ACF increases as the number of years since the class member retired increases. *See id.* at 21. It is derived by applying actuarial factors and assumptions based on average characteristics of the federal workforce during the period covered by the lawsuit.

## 3. Settlement Administration

Under the settlement, court-approved service providers will administer the settlement in collaboration with class counsel. The government will pay its lump sum payment into a trust account supervised by the court-approved Trustee. The Trustee is responsible for overseeing the investment of the settlement monies and the activities of the other service providers (the Settlement Administrator and Settlement Adjudicator). *See* Sett. Dist. Plan § II.A.3.

The Settlement Administrator's responsibilities include calculating the amounts due the class members, managing class member communications, and administering the claims and challenge process following final approval of the settlement. *See id.* at § II.A.1. The Settlement Adjudicator is responsible for resolving authorized appeals over the accuracy of the data used to calculate class member payments; claims filed by successors of deceased class members; and claims filed by individuals not in the database of class members, but who assert class member status.[4] *See id.* at § II.A.2.

## 4. The Claims Procedure

The settlement provides that, after approval, class members will be mailed distribution packages describing the amounts they are owed and providing the personnel information used to calculate those amounts. *See id.* at § V. Class members will then have the choice either to claim the payment that was calculated by simply signing and returning the claim form that will be included with their distribution packages or they may file a challenge if they believe the personnel data

4. The court approves the joint proposal, filed May 21, 2002, that Lester J, Levy, Esq. serve as

the Settlement Adjudicator.

used to calculate the payment is inaccurate. *See id.* at § VI.

Successors of deceased class members and representatives of legally incompetent class members will have a similar opportunity to file a claim for the money owed the class member and to challenge the accuracy of the personnel data upon which the payment calculation is based. *See id.* at § VIII. In addition, individuals who are not in the database of class members but believe they fall within the class definition will have a chance to file a claim for class membership. *See id.* at § VII.

### 5. Distributions

The settlement provides for two distributions to be made to class members and their successors. *See id.* at § XI. The initial distribution will be made to class members who timely return the claim form. *See id.* at § XI.A. These individuals will receive 80% of the total amounts that they are estimated to be owed under the settlement (unless the Trustee decides that payment of a different percentage would better serve the purposes of the settlement). *See id.*

The final distribution will occur after all challenges, successor claims, and claims for class membership have been resolved. *See id.* at § XI.B. This will be a pro rata distribution of all remaining monies, minus a small reserve held back for final administration expenses. *See id.* Any amounts left in the reserve after all settlement administration expenses have been covered will be donated to charity. *See infra,* p. 805.

### 6. Settlement Administration Expenses

Under the terms of the settlement, OPM is required to make a $400,000 payment to cover initial settlement administration expenses. *See* Sett. Agr. ¶ III.B. All additional settlement administration expenses will be paid from the government's lump sum payment, plus any earnings on that payment. *See* Sett. Dist. Plan §§ II.B, XI.E. These additional costs were considered by the parties when they agreed upon an appropriate lump sum amount.

### 7. Attorney Fees

The settlement agreement makes provision for class counsel's petitioning for a common fund attorney fee award. *See* Sett. Agr. ¶ VII.C. Consistent with the settlement agreement, class counsel have submitted an unopposed fee petition for 10% of the total amounts paid to the class. The government has agreed to pay $3,600,000 in attorney fees. This amount will be credited to the class. *See id.* As a result, the class's fee contribution would be reduced to approximately 8%. The government has also agreed to pay $500,000 to cover legal expenses. *See id.*

### C. Preliminary Approval

On June 17, 2002, this court granted preliminary approval of a proposed settlement presented to the court on March 15, 2002. On April 24, 2002, the court asked for supplemental information regarding the settlement and fees. Following its review of the information received in response to its request, the court found that, "the proposed Settlement preliminarily appears to be a fair, reasonable, and adequate resolution of this matter, and that consideration of the settlement by the plaintiff class and further consideration of it by the court are appropriate." Under the terms of the proposed agreement, the parties were to take certain actions to effect notice of the settlement to the class, to be followed by a fairness hearing which was scheduled and then held on November 18, 2002.

### D. Notice of the Settlement to the Class Members

In keeping with the terms of the settlement, following preliminary approval of the settlement, the Settlement Administrator mailed notice of the terms of the proposed settlement to all known class members. About 92.5% of the class members received this notice at their current home address. *See* Decl. of Nicole Fahey ¶ 10. This high percentage of successful mailings was achieved because OPM provided the Settlement Administrator and class counsel with the names and social security numbers of all class members, as well as the current addresses for class members receiving retire-

ment annuities. *See id.* at ¶ 8. Class counsel searched NTEU's databases for other class member addresses and provided those to the Settlement Administrator. The Settlement Administrator used a commercial locator service to find current addresses for the remaining class members. *See id.*

In addition to the home mailing, the notice was also published in seven major newspapers, on OPM's web site, and on a special litigation web site established by the Settlement Administrator, *www.SpecialRatesSettlement.com. See id.* ¶¶ 13, 23. The settlement documents themselves were posted on the website and were mailed to class members on request. *See id.* ¶¶ 23, 27.

Several resources were available for class members with questions about the settlement. The litigation web site, composed by class counsel, contained detailed information about the settlement. *See id.* ¶ 23. The Settlement Administrator, in collaboration with class counsel, also maintained a toll free hotline number, with a recorded message containing information about the settlement and, after July 2, live operators were available to answer questions from class members. *See id.* at ¶¶ 14–21. The live operators forwarded to class counsel any callers with questions they could not answer themselves.

It has been represented to the court that many class members took advantage of these resources. Between July 2, 2002, when the hotline became operational, and August 29, 2002, the day after the deadline for class members to submit comments on the proposed settlement, there were 14,401 calls to the hotline; 4,128 callers spoke with the live operators. *See id.* at ¶ 21. During a similar time frame, 11,121 individuals visited the web site, logging 1,490,710 contacts with different pages on the site ("hits"). *See id.* at ¶ 24. Class counsel also represented that they personally responded to numerous calls and letters raising questions about the settlement.

### E. Fairness Hearing

On November 18, 2002, the court conducted a fairness hearing. At the hearing, class counsel and the government spoke at length about the fairness of the settlement, the in-

tegrity of the procedure, and responded to the comments received. Two individuals, who had expressed a desire to appear at the fairness hearing, and who were invited to participate, chose not to attend. However, two other class members appeared at the hearing and were given an opportunity to express their views and ask questions of the class counsel. The questions and objections of all those who attended, as well as those who did not attend the hearing are addressed in the section on comments received on the settlement, which is set forth below.

## II. ANALYSIS

### A. Legal Standard

■ Rule 23(e) of the Rules of this Court, as well as of the Federal Rules of Civil Procedure, states that "[a] class action shall not be dismissed or compromised without the approval of the court ...." Such approval should be given based on the court's assessment of the reasonableness of the proposed compromise, taking into account the context in which the settlement was reached. While the reviewing court must assess the strength of plaintiffs' claims when evaluating the adequacy of a proposed class settlement, it should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

■ It also is appropriate for the court to defer to the judgment of the lawyers supporting the proposed settlement. While not controlling, "[a] court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof." *Stewart v. Rubin,* 948 F.Supp. 1077, 1087 (D.D.C.1996). *See Hammon v. Barry,* 752 F.Supp. 1087, 1093 (D.D.C.1990). In particular, the professional judgment of plaintiff's counsel is "entitled to considerable weight in the court's determination of the overall adequacy of the settlement." *Luevano v. Campbell,* 93 F.R.D. 68, 88 (D.D.C. 1981).

■ Finally, the fact that a proposed settlement has already received preliminary approval counsels strongly in favor of approv-

ing the settlement even over any objections that may be lodged against it. Thus,

> [p]reliminary approval is critical for a decree which is the product of arms-length negotiations. With such approval a decree is presumptively reasonable. *See Stotts,* 679 F.2d at 551; *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir.1980); *United States v. City of Miami,* 614 F.2d at 1333. An individual who objects, consequently, has a heavy burden of demonstrating that the decree is unreasonable. *See Stotts,* 679 F.2d at 551; *Village of Arlington Heights,* 616 F.2d at 1014.

*Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983).

## B. Final Approval of Settlement Agreement

After carefully reviewing the settlement proposal and all of the comments from class members, this court concludes that this settlement is fair, adequate, and reasonable and therefore must be approved.

### 1. The Objections to the Settlement Do Not Warrant Disapproval

Although the class has over 200,000 members, only 131 were letters received by the Settlement Administrator and postmarked by the deadline for filing comments during the comment period. No class member asked to opt-out of the settlement. Of those timely commenting on the settlement, sixty-six offered their unqualified support and sixty-five objected to some aspect of the settlement. The settlement administrator noted that three of the objections were filed by individuals who are not in the class database (02791, 04037, 04094), and who may not be class members. In addition, thirteen class members submitted form letters voicing the same set of objections (02476, 02708, 02825, 03467, 03472, 03731, 03926, 04035, 04036, 04225, 04226, 04227).

■ In evaluating approval of a settlement, there is no question that the small number of objections weighs in favor of the court's approval. *See Hammon v. Barry,* 752 F.Supp. 1087, 1093 (D.D.C.1990) (small number of objections is an indication of settlement's fairness). The court's role in evaluating the class member objections is to determine whether the settlement is fair to the class as a whole. *See Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C.1999), *aff'd* 206 F.3d 1212 (D.C.Cir.2000), *reconsideration denied,* 127 F.Supp.2d 35 (D.D.C.2001); *Thomas v. Albright,* 139 F.3d 227, 233 (D.C.Cir.1998). Thus, "[a] fair settlement need not satisfy every concern of the plaintiff class." *Alliance to End Repression v. City of Chicago,* 91 F.R.D. 182, 195 (N.D.Ill.1981). As discussed below, the court is persuaded that none of the objections raised undermine the fairness of the settlement to the class as a whole.

### a. Objections to the Sufficiency of the Lump Sum

■ Five class members (00011, 02656, 02985, 03129, 03373) and one individual not in the database of class members (04094) questioned the sufficiency of the government's lump sum payment. As a basis for their objection, some simply divide the lump sum amount by the number of class members and argue that this amount is not enough. This objection is however based on a misunderstanding of the settlement agreement and the formula that has been developed.

It has been clear in the notice and correspondence with class members that not everyone who is a member of the class will receive back pay. Only those special rate employees who did not receive pay increases equal to those they were entitled to under the pre–1982 "alignment" rule, and thus were harmed by the invalidated OPM rule, will be compensated under the settlement. *See* further discussion *infra* p. 806. Those class members who received increases between 1982 and 1988 that were actually higher than the increases they would have received under the alignment rule were not adversely affected by the invalidated OPM rule and are not entitled to any back pay. In addition, there is great variability over the extent to which other class members were harmed by OPM's post–1982 practice. Some special rate employees had their pay frozen throughout the entire period covered by the lawsuit and stand to recover a substantial amount. Oth-

ers were affected for only one or two "snap-shots" or periods between pay raises and will recover small amounts.

Moreover, the objectors' concerns about the sufficiency of the lump sum are misplaced. The lump sum payment was based upon the substantial information the parties possessed from OPM regarding the potential size of the recovery. The Settlement Administrator performed preliminary calculations of the total amount owed the class under the remedial methodology. *See* Asher Decl. ¶ 12. Class counsel then made adjustments to take into account a variety of factors, such as the potential for errors in the database used to calculate class member recoveries, additional interest owed to the class, the earnings the lump sum amount will generate, the taxability of those earnings, the likely response rate of class members who will file claims or challenges, and the costs of administering the settlement. Ultimately, the court is persuaded that class counsel negotiated a figure that is sufficient to satisfy the government's total liability to the class.

### b. Objections to the Accuracy of the Databases

██ Four class members (00011, 00157, 02437, 03580) raised concerns about the accuracy of the databases to be used to calculate class member recoveries. In response, class counsel retained an expert to verify the accuracy of OPM's back pay calculation database and the court is persuaded that it is sound. *See* Asher Decl. ¶ 8. While the identification of class members is not perfect, it appears from the notice procedure that the database of class members has a high degree of accuracy.

The government provided information about the construction of the class member database to class counsel, and class counsel had that information reviewed by a statistician. While the degree of error in the process used to identify class members appears to be quite small, class counsel explains that it weighed the potential error factor in negotiating the lump sum amount and the Settlement Distribution Plan. Moreover, there is a procedure for individuals who do not appear in the class member database to file a claim

for class membership following final approval of the settlement. Given the large numbers of class members already identified, it is unlikely that many class members have not been included in the settlement. Finally, as noted above, the court has no reason to question class counsel's judgment that the lump sum is sufficient to pay any individuals who can establish that they do indeed meet the class definition.

### c. Objections to the Remedial Methodology

Only sixty-one class members, representing .028% of the class, lodged objections to some aspect of the proposed remedial methodology, which is the heart of the settlement. The objections can be divided into the following twelve categories.

#### (1) Individualized Calculation

██ A number of class members believe that there should be more individualization in the back pay calculations. Seven state simply that the settlement is unfair because it does not provide for calculations based on the reconstruction of the full personnel histories of each class member (00008, 02660, 03389, 03630, 03911, 04082, 04088). Others argue that they personally would be disadvantaged because the remedial methodology does not provide compensation for every injury, no matter how remote, possibly caused by operation of OPM's 1982 rule, such as receipt of a lower disability payment (02007, 03356) or life insurance benefit (04082, 04088). Still others objected to some of the assumptions used in the remedial methodology, which are discussed *infra* at 804.

The court finds that the settlement is fair and reasonable without providing the type of individualized calculations requested by these objectors. The court is persuaded by the parties that this type of calculation simply was not feasible. As discussed above, gathering completely individualized personnel data for all 210,000–plus class members, who worked in hundreds of jobs in dozens of agencies of the federal government at locations around the world, would have taken many additional years to accomplish, if it could have been accomplished at all. A substantial amount of this data was not main-

tained in any centralized format, and the parties would have had to review each class member's official personnel file ("OPF").

OPFs of current employees are maintained in individual agency personnel offices around the world. Moreover, it is not unusual for OPFs to contain hundreds of pages of personnel documents. The process of compiling a complete personnel file for each of these 212,000 class members would have delayed payment to the class for years. To expedite payment, the court finds that the parties devised a fair formula-based approach, which uses the best and most readily accessible data for calculating back pay pursuant to the Federal Circuit's-endorsed alignment.

In this connection, the court recognizes that the settlement does provide for calculations that are quite individualized in important respects. Data concerning the class member's agency, occupation, geographic location, and grade will be used to compute back pay amounts. This information will be reexamined at up to thirteen different snapshot dates. In addition, specific back pay amounts have been determined for each grade on each of the 225 special rate tables affected by the invalid OPM rule for every snapshot for which back pay is owed. Finally, the class member's actual date of retirement (if any) will be used for purposes of calculating any retirement benefit he or she may be owed.

Given the limitations on conducting complete individualized back pay calculations for each class member, the court finds that the parties' approach is fair and reasonable to the class as a whole.

### (2) Comparability Increases

Seventeen class members (00013, 00022, 00025, 02476, 02656, 02708, 02825, 03467, 03472, 03731, 03926, 04035, 04036, 04223, 04225, 04226, 04227) urge the court to reject the settlement because it does not provide class members with retroactive payment of the full "comparability adjustments"—also commonly referred to as "cost-of-living adjustments"—that were granted to the general schedule employees during the years covered by the lawsuit. These objections do not provide a basis for not approving the settlement because they advocate an approach that

was specifically rejected by the court of appeals in its 1998 decision. In that decision, the Federal Circuit held that class members are not entitled to back pay based on the comparability adjustments received by general schedule employees; it provided that class members are entitled *only* to the alignment adjustments calculated through retroactive application of the pre–1982 alignment rule. *See NTEU v. King*, 132 F.3d at 741–42.

### (3) Three–Month Rule

Fourteen class members (00023, 02476, 02708, 02825, 03189, 03467, 03472, 03731, 03926, 04035, 04036, 04225, 04226, 04227), including one class member who appeared at the Fairness Hearing, objected to the settlement's adoption of the "three-month rule" as part of the settlement formula. Under that rule, any special rate pay increases granted special rate employees in the three months immediately preceding the general schedule increase are not to be included when performing the alignment to determine the amount of back pay owed the class members. Instead, the special rate salaries in existence *before* any special rate increases granted within the relevant three-month period are to be aligned at the time of the general schedule increase. In addition, any special rates *first* authorized within the three months immediately preceding a general schedule increase will not be aligned at that initial increase.

As explained by the parties, the purpose of the three-month rule is to permit the retroactive application of the alignment rule while at the same time heeding the Federal Circuit's instruction that class members should not ride a "double escalator" and thereby receive a double recovery. *See NTEU v. Horner*, 869 F.2d at 572. It was clear throughout the litigation that class members could not receive both the special rate increase and the general schedule raise.

According to the parties, during the back pay period, OPM operated under the assumption (codified in the rule ultimately determined to be unlawful) that a general schedule pay increase would have no impact on special rate salaries. As such, OPM peri-

odically used its statutory authority to independently determine the size of the increase necessary to recruit and retain special rate employees. For example, if OPM believed it needed to increase the salaries of a category of employee by $5000, it would authorize a $5000 pay increase for that year. Had it known, however, that another pay increase would be due those employees when the general schedule received a pay increase in January, it would have factored in the amount of this other increase, thereby reducing the amount of the earlier special rate increase.

The court finds that the three-month rule is a reasonable way to recreate the pay adjustments on a retrospective basis. To the extent that the application of the rule results in a class member not receiving back pay for a particular payment period, that lack of payment is because he or she was not harmed by OPM's post–1982 practice, but instead received an equal or *greater* independent special rate pay increase than the alignment increases allowable under the Federal Circuit's 1998 decision.

#### (4) The Step 5 Assumption

■ Five class members (00019, 02660, 02782, 04088, 04127) challenge the parties' assumption that each class member was paid at step 5. Class counsel explains that contrary to these class members' assertions, both the use of a single step in the remedial methodology and the choice of step 5 are reasonable decisions, fair to the class as a whole.

The parties chose to assign each class member to a single step for logical reasons of administrative convenience. Using all ten steps on the pay scale for each grade on each special rate table would have greatly complicated the construction of the payment database, thereby further delaying recovery. At the same time, it was determined that the use of actual step rates likely would not have made a substantial difference in any class member's actual payment amount. There would be only a small variation in back pay owed at each step. *See* Asher Decl. ¶ 7.a.

Class counsel explains that step 5 was chosen because it was the average step occupied by general schedule employees during the period covered by the lawsuit. One class member claims that this choice results in the higher salaried class members subsidizing the lower salaried class members (02660). However, as class counsel explains, this objection reveals a misunderstanding about the operation of the alignment rule.

Contrary to the assumption of the objector, there is no correlation between a higher salary and a larger back pay amount. This is because back pay is wholly contingent on how closely the special rate salary aligned to the general schedule. The closer to alignment a particular salary was, the lower the amount of back pay owed, regardless of the grade or step the class member occupied. Accordingly, application of the alignment rule does not necessarily lead to greater back pay for class members at the higher steps. The step 5 assumption thus neither uniformly penalizes those at steps 6 through 10, nor helps those at the lower steps. The court agrees that the selection of step 5 is a reasonable assumption that is fair to the class as a whole.

#### (5) Use of Snapshots

Two class members object to the use of "snapshots" of personnel data (00019, 00020). Snapshots, i.e. the periods of time between which pay increases were given, come into play in three aspects of the settlement. As class counsel explains, snapshots were used to identify the twelve different payment periods affected by the lawsuit. Each payment period begins and ends with a snapshot date corresponding to either a general schedule pay increase or a special rate pay increase. These are the only events that trigger a change to the amount of back pay owed at a particular grade on a particular special rate table, so these snapshot dates would be used even if purely individualized calculations were being performed.

Second, class member personnel data were compiled on each of the thirteen snapshots for which a class member was a special rate employee. These data will be used to determine the special rate table under which each class member was paid. While personnel actions that occur between snapshots are not taken into account until the next snapshot date, the snapshots occur frequently enough

to capture these "between snapshot" changes, such as a grade increase, within a reasonable amount of time. This approach is a reasonable alternative to sifting through millions of pages of individual personnel files to cull this data.

Third, snapshot dates will be used to determine the proportion of the back pay owed the class member for a particular payment period. If the class member occupied the same grade on the special rate table for the snapshots making up the beginning and end of the payment period, he or she is entitled to collect the full amount of back pay due for that grade for that period. If the class member was at a grade on a table for only one of the two snapshots, he or she is entitled to collect half of the back pay amount due for that period. This approach is intended to account for the movement of class members into and out of jobs and grades within jobs.

Given the administrative constraints facing the parties, the court finds that this approach is reasonable and fair.

### (6) Premium Pay

■ Four class members (00015, 02668, 03139, 03608) object to the three percent premium pay add-on, arguing that they personally earned more premium pay during the period covered by the lawsuit. Three percent is slightly higher than the average amount of premium pay earned by general schedule employees during the years covered by the lawsuit. Because it is an average, some class members, by definition, will have earned premium pay in excess of three percent of their pay during those periods for which they are owed back pay under the settlement. Similarly, some will have earned no premium pay during those periods.

Class counsel concluded that an averaging approach on the premium pay issue was in the best interests of the class as a whole. Premium pay records do not even exist for many agencies for the years covered by the lawsuit. Even if they did exist, they would not be centralized and would require examination on a class member-by-class member basis. In such circumstances, the court finds that the approach adopted by the parties is fair and reasonable in order to avoid excessive delay of payment to the class members.

### (7) Interest

Two individuals commented on the interest provisions of the settlement (00014, 03139). One person stated that interest should be paid "on the money amount of the $173 million not on the money that is due each individual. . . ." Under the settlement, the government will pay interest on the $173.5 million lump sum payment (because final approval did not occur by August 31, 2002) *and* class members will receive interest calculated on their individual back pay amounts. Interest will be calculated at the very favorable Back Pay Act rates. The only aspect of the remedy for which interest is not payable is the retirement payment, because there is no "express authorization" in the Back Pay Act for payment of such interest. *See Gibson v. OPM*, 93 M.S.P.R. 301, 2002 M.S.P.B. LEXIS 976 (2002); *cf. Kesselman v. OPM*, 47 M.S.P.R. 293 (1991) (finding no waiver of sovereign immunity for payment of interest on delayed retirement benefits).

The second commenter stated that interest should run until the time class members are actually paid. In fact the settlement provides that interest will be paid as the class member suggests. The class member was apparently confused by a provision of the settlement agreement, section IV.A.1.b, concerning the government's obligation to provide data to the Settlement Administrator, including the amount of interest on back pay for each special rate table earned as of December 1997. The Settlement Administrator will supplement this interest calculation with its own calculation of the interest that accrued after 1997. In view of the foregoing, the court finds that none of the objections to the interest issue provide a basis for not approving the settlement.

### (8) Retirement Payment

Nine class members object to the retirement pay calculation (00009, 00017, 00025, 00026, 02660, 03630, 03911, 04082, 04088). For the most part, these objections state that the retirement payment should be based on reconstruction of the full personnel histories of class members, and that class member annuities should be adjusted.

The parties developed the retirement payment portion of the remedial methodology for the same reason they adopted the remedial methodology in general—namely, to avoid the delays and difficulties inherent in individualized computations. Instead, the parties developed a methodology that reflects actual personnel data (like the actual date of retirement) and assumptions based on class-wide information (like age at retirement and years of service).

The parties also determined that the retirement payment would consist of a single lump sum amount to compensate class members for improperly calculated annuity payments already received *and* for those yet to be paid. This approach allows for a more expeditious retirement pay calculation. In addition, the parties assert that most individuals prefer receiving lump sums to having their payments stretched out for several years. The court finds, based on the foregoing, that the objections to the retirement pay approach under the settlement formula do not provide any reason not to approve the settlement.

### (9) Adjustments to Current Salary

Four class members object to the settlement because it does not result in an increase to their current federal salaries (00013, 03911, 04088, 04094). As class counsel pointed out to the court, these objections are largely based on the flawed assumption that special rate employees are entitled to the full comparability increases that were granted to general schedule employees during the period covered by the lawsuit. As discussed above, the Federal Circuit rejected this position and instead adopted the pre–1982 alignment rule as the proper measure of damages. Moreover, class counsel has stated that for a period of years after 1988, OPM resumed its practice of passing along to special rate employees the entire increase received by general schedule employees. *See NTEU v. Horner,* 869 F.2d at 577 (citing Fed. Pers. Man. Bull. 530–63 (July 15, 1988)). Accordingly, after 1988, special rates employees received pay increases that often far exceeded the alignment increases they were due under the 1998 Federal Circuit decision. Consequently, when the alignment rule is retroactively applied to determine the salaries special rate employees should have received, it is clear that all salaries were back in alignment by the end of 1990. In view of these facts, the objections based on special rate employees concerns regarding their current salaries do not provide a basis for not approving the settlement.

### (10) Promotions

■ Fourteen class members claim an adjustment to their current salaries is due because, they assert, they would now be at a higher pay step had the invalid OPM rule not been in effect when they were promoted during the period covered by the lawsuit (00008, 00012, 00018, 02437, 02752, 03328, 03333, 03580, 03719, 03890, 03913, 04031, 04159, 04223). Class counsel contends that these claims are speculative for a number of reasons. First, to determine, that a class member had not been promoted to the correct step on the GS scale, it would be necessary to conduct a highly individualized personnel record reconstruction that would, among other things, examine whether: (1) the class member was promoted from a special rate job to a non-special rate job; (2) the class member was owed back pay for more than one payment period immediately preceding the promotion; and (3) the amount of that back pay was enough to cause the class member to be promoted to the wrong step. Determining whether any class members actually were promoted to the wrong step would thus require a reconstruction of that person's employment history and a manual comparison of a range of salary figures. Given these obstacles, and the resulting additional delay in payment, class counsel determined that it would be in the interest of the class as a whole to adopt the remedial methodology approach. The court cannot disagree with class counsel's determination that the approach adopted was not fair and reasonable under the circumstances. As noted above, the court finds in connection with these objections as it did with regard to other objections regarding the desire for complete individualized calculations that the trade-off made by class counsel was reasonable, and thus, the objections about pro-

motions do not provide a basis for rejecting the settlement.

### (11) Taxation

Three class members (00016, 04082, 04088) object to any taxation of their back pay, or to its taxation at their current tax rates, which allegedly are higher than the rates they would have been taxed at when they earned the money. Contrary to the objector's desires, federal law requires withholding of taxes on payments, such as these, that are in the nature of back wages. *See* 26 U.S.C. § 3401(a). Moreover, the law requires that taxes be paid at the taxpayer's current tax rate. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 209, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001). Accordingly, these objections do not provide a basis for rejecting the settlement.

### d. Miscellaneous Remedial Methodology Objections

Five other objections to the remedial methodology were raised. One class member (00011) suggests that class members should be given additional service time toward retirement instead of back pay One comment suggested that compensatory damages and punitive damages should be considered. In all of these instances, class counsel explained to the court that there is no statutory authority for these types of remedies in this case. In such circumstances, these objections do not provide a basis for rejecting the settlement.

Another class member (00368) objects on grounds that the class members' present grades and occupations are not relevant to the back pay calculation. This class member must have been confused, because present grades and occupations in fact play no role in the calculation.

Finally, one class member (00157) complains that the remedial methodology is too hard to understand. While the court agrees that the remedial methodology is complicated, class counsel together with the settlement administrator have done an excellent job in endeavoring to explain it to the class members. The remedial methodology itself, has been made available on-line with all the other

pertinent settlement documents. In addition, the web site, which the court has reviewed, directed class members to the telephone hotline established by the Settlement Administrator. Trained operators employed by the Settlement Administrator were available to answer questions from class members. Class counsel also answered many written and telephone inquiries. In short, the court is persuaded that the parties have done all they could to explain how they have agreed in essence to return class members to the pre–1982 status quo with a modified formula that implements the pre–1982 alignment rule. Because of the explanations provided and the fact that the settlement is a reasonable means of implementing the prior rule, the court finds that these concerns do not provide a basis for rejecting the settlement.

### e. Objections to the Settlement Distribution Plan

Only six class members lodged objections to provisions contained in the Settlement Distribution Plan. These objections covered the following six topics.

Two objectors (03911, 04088) are concerned about the possibility that class members who bring successful challenges could end up getting less back pay. Such a hypothetical outcome would be a function of the court-endorsed alignment rule. A correction of personnel data as a result of a challenge does not necessarily mean that a class member would be legally entitled to more back pay. For example, a grade 12 medical officer may be entitled to less back pay than a grade 11 medical officer, because the salary paid the grade 12 employee was more closely aligned to the appropriate general schedule salary. In that example, a class member who successfully establishes that she was paid at grade 12 rather than grade 11 would receive less back pay.

Two other objectors (00008, 03389) argue that the government should be responsible for the costs of settlement administration. As noted above, the government agreed to pay $400,000 separately from the lump sum to cover initial administration expenses.

Moreover, the court is persuaded that the lump sum is sufficient to cover all other administrative costs and still provide full relief to the class members.

■ Two individuals (03630, 03911) indicated a preference for the government to administer the payout. The parties determined, however, that it would be more efficient for the government to pay a lump sum amount to the class that third-party class action experts would administer under the supervision of class counsel. Sufficient oversight and protections are contained in the settlement to assure competent performance by these service-providers. The distribution plan developed by the parties will allow for reasonably prompt and accurate distributions to be made to the class without the difficulties that can accompany government payouts. Moreover, the court is requiring quarterly reports from the settlement trustee to monitor progress in the administration of the settlement.[5]

In this connection, the court has also considered the comment of one of these class members (03630) who is also concerned that the settlement does not require the Trustee to be bonded. The parties have previously addressed this issue. Based on the representations to the court, the court has concluded that bonding is not required at this time.

This same class member objects to payment being spread over two distributions. The two-distribution approach allows for all class members (both those filing claims and challenges) and successors-in-interest to share equally in the slight risk that the lump sum is not sufficient to provide full payment to the class or in the chance that the lump sum is more than enough.

The alternative would have been to delay all payment until all challenges, claims for class membership, and successor claims were resolved. The court finds that class counsels' conclusion that it would best serve the interests of the class as a whole to provide for the prompt payment of a high percentage of the amounts owed to class members filing claims was reasonable. This conclusion is buttressed by the fact that the settlement provides for interest to continue to accrue until the balance is paid at the final distribution.

Finally, one class member (00019) is concerned about the identity of the charity to which any amounts remaining in the small reserve will be donated (after the final distribution has been made and all administrative costs paid). That class member argues that it should not be a religious organization, citing separation of church and state principles. The court agrees that this could be a concern. Class counsel have indicated that they intend to select the Federal Employee Education and Assistance Fund ("FEEA") as the recipient of this small donation. FEEA "is a private, not-for-profit 501(c)(3) tax-exempt corporation which provides educational benefits and emergency assistance exclusively to all civilian federal and postal employees and their dependent family members." *See* www.feea.org. To the extent that there are administrative funds remaining they *shall* be directed to the FEEA.

**f. Objections to the Information Provided to the Class**

■ Sixteen class members object because they have not been told what their individual recoveries will be (00008, 00157, 02467, 02708, 02825, 02985, 03189, 03467, 03731, 03926, 04035, 04036, 04037, 04225, 04226, 04227). The court reads these objections as objections to the adequacy of the

5. On May 21, 2002, the parties filed, and the court approved, a Joint Proposal of a Detailed Plan for Providing the Court with Regular Reports from the Trustee. This filing stated:

The parties propose that the Trustee submit quarterly reports to the Court on a calendar quarter basis, with the first report due at the end of the first quarter in which the government makes the Settlement Payment.... The Trustee also shall provide annually cumulative reports ... The Trustee shall submit a final

report when the Trust has terminated.... In addition to these periodic reports, the Settlement Trust Agreement (at 10) requires that the Trustee also furnish the Court with copies of the Trust's monthly and annual financial statements prepared by the Custodian, current reports on the Custodian's internal controls prepared in accordance with SAS 70, and the annual letters of opinion provided by an independent firm of certified public accountants.

notice and finds that they are not substantiated.

Here, the notice provided to the class was clearly adequate. It sets forth the aggregate amount to be paid to the class, the formula for distributing that amount among the class members, and the class members' due process rights. The class was provided with more than sufficient information to evaluate whether the settlement adheres to the Federal Circuit's 1998 decision. Since the court finds that the settlement is consistent with the Federal Circuit's 1998 decision, it finds that any amounts class members receive through the settlement will be fair.

A review of other settlements reveals that it is not unusual in class actions for class members not to know the amounts they will be receiving until after final approval. In this case, for example, all of the information needed to perform that calculation is not yet available. The Settlement Administrator will calculate the approximate amount of the individual recoveries shortly after final approval, using the information contained in the settlement database and including an interest calculation to the relevant date. At that point, the Administrator will notify class members of the approximate sum. Class members will have the opportunity to accept that sum or challenge the data upon which the calculations are based. Those who accept can expect to receive 80% of that sum, in the first distribution. The precise amounts owed to individual class members will not be known until all claims and challenges have been filed and resolved, around the time of the second distribution.

As the court has stated, the class members' lack of knowledge regarding the precise amounts they will collect under the settlement is not a valid basis on which to find the settlement unfair. Sufficient information has been made available to allow the class to make an informed evaluation of the settlement's terms.

Moreover, the court is satisfied that the allocation among class members does not raise any concerns. Class counsel provided the court with a break-down of the anticipated distribution of the settlement proceeds.

The following chart was provided for the court's consideration:

| Preliminary Range of Recovery | Estimated Number of Class Members Within Range |
|---|---|
| $50,001 to $85,000 | 49 |
| $20,001 to $50,000 | 662 |
| $10,001 to $20,000 | 332 |
| $5,000 to $10,000 | 666 |
| $2001 to $5000 | 6,365 |
| $1001 to $2000 | 32,736 |
| $1000 or less | 87,749 |
| No entitlement | 84,053 |

This preliminary report is consistent with the parties' representations throughout the settlement approval process that only those class members who were injured by the invalid OPM regulation will be compensated. As discussed above, if special rate employees received special rate pay increases during the years covered by the lawsuit that equaled-or, more likely, exceeded-the increases that would have been due under the application of the alignment rule, they cannot recover under the approach approved by the Federal Circuit. *See NTEU v. King*, 132 F.3d 736 (Fed.Cir.1998). Because they suffered no injury, these class members have no claim to further compensation under any remedial approach, whether it be achieved through litigation or settlement.

### 2. Supportive Comments

Finally, the court is also mindful of the fact that over half of the comments received on the settlement were supportive. These comments identified the efforts of class counsel and NTEU in this case. Others mentioned the extraordinary lump sum amount and the completeness of the remedy. The consensus was that the settlement is fair and should move forward without delay.

### C. Attorney Fees and Costs

▮ Finally, the court must also consider for approval the attorneys fees and costs provisions of the settlement agreement. As

mentioned in the background of this order, the settlement agreement makes provision for class counsel's petitioning for a common fund attorney fee award. *See* Sett. Agr. ¶ VII.C. Consistent with the settlement agreement, class counsel have submitted an unopposed fee petition for 10% of the total amounts paid to the class. The government has agreed to pay $3,600,000 in attorney fees. This amount will be credited to the class. *See id.* As a result, the class's fee contribution would be reduced to approximately 8%. The government has also agreed to pay $500,000 to cover legal expenses. *See id.*

Only seven class members, referenced the attorney fees provision of the settlement (00001, 00002, 02437, 02782, 03389, 03630, 04082). In general, the few comments received on this topic questioned the amount of the common fund fee award or the notion that the class should contribute anything for the legal work performed.

The court concurs with class counsels' contention that the fact that the attorney fees provision has received such an infinitesimally small number of adverse comments from this large class underscores its reasonableness. In addition, the court has considered the fact that the class representatives strongly support class counsel's common fund fee request. *See* Decls. of Robert A. Morris ¶ 9, Carol Rose ¶ 9, Lila Sanders ¶ 5. As Mr. Morris notes,

> I know that NTEU's attorneys worked hard on behalf of the class at every step of the way and had to deal with a lot of resistance from the government. In light of their efforts, I think the Court should grant class counsel's attorney fee petition. I believe that the eight percent contribution that the class would make if class

counsel's attorney fee petition is granted is fair and reasonable.

Further, the court recognizes that class counsel's request for a 10% common fund award is well below the typical 20–30% fee awards in class actions. *See* Conte, 1 Attorney Fee Awards at 50–54 (2d ed.1993); *Awarding Attorney Fees and Managing Fee Litigation,* at 68 (1994). In addition, the court recognizes that the government's agreement to pay $3.6 million of class counsel's attorney fee award has worked to reduce the contribution from the class to approximately 8% of the amounts they are paid. While this is still a substantial sum, given the recovery of more than $173.5 million, it is reasonable and justifiable. Class counsel have worked for almost twenty years to obtain monetary relief for the class. Counsel will be spending additional substantial time over at least the next four years to ensure that the settlement is implemented fairly and completely.

## III. CONCLUSION

For the reasons stated, the court finds that this settlement is fair, adequate, and reasonable, and therefore **APPROVES** this class-action settlement proposal. The parties' Joint Motion for Final Approval of Settlement Agreement, filed on October 15, 2002, is hereby **GRANTED**.

**IT IS SO ORDERED.**