Thomas GREENE, Appellant,

v.

PASCHALL TRUCK LINES; Hon. R. Scott Borders, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2006–CA–001974–WC.

Court of Appeals of Kentucky.

Oct. 26, 2007.

Craig Housman, Housman & Associates, Paducah, KY, for appellant.

R. Chris Hutson, Whitlow, Roberts, Houston & Straub PLLC, Paducah, KY, for appellee.

Before NICKELL and TAYLOR, Judges; PAISLEY,[1] Senior Judge.

## OPINION

NICKELL, Judge.

Thomas Greene (hereinafter "Greene") seeks review of an August 15, 2006, opinion of the Workers' Compensation Board (hereinafter "Board") affirming a February 10, 2006, opinion of Administrative Law Judge Hon. R. Scott Borders (hereinafter "the ALJ"). The ALJ's opinion dismissed Greene's claim for permanent disability income benefits and granted partial future medical benefits for injuries arising from a work-related collision. The ALJ also declined to review, citing a lack of jurisdiction, an agreement reached between Greene and his former employer, Paschall Truck Lines (hereinafter "PTL"), pertaining to payment of a subrogation lien. A petition for reconsideration filed by Greene was summarily dismissed by the ALJ on March 13, 2006. The Board then affirmed the ALJ's decision in all respects and this appeal ensued.

For the reasons explained herein, we affirm that portion of the Board's opinion dismissing Greene's claim for permanent disability income benefits. We further affirm the Board's opinion limiting PTL's responsibility for future medical expenses to the ongoing removal of glass as it works its way to the surface of Greene's skin. However, because we hold the ALJ had jurisdiction to review the settlement agreement reached between Greene and PTL, but declined to exercise it, we vacate that portion of the opinion and remand it to the Board for further proceedings.

Between 1996 and September 2005, Thomas Greene was a truck driver for PTL. He was hired at PTL's hub in Murray, Kentucky, and it is from that office that he was routinely dispatched to make deliveries along the eastern seaboard. Occasionally he took a leave of absence from PTL to spend time with his daughter. When not driving for PTL, he often worked as a certified union millwright through Fru–Con in his native Louisiana. Each time Greene resumed driving for PTL he completed employee orientation[2] in Murray and signed paperwork specifying any work-related injury would be resolved under Kentucky law regardless of where it occurred.

On May 20, 2003, while Greene was driving a PTL semi in North Carolina, he collided with an axle that had separated from a semi being driven by Cathy Maddox (hereinafter "Maddox") on behalf of U.S. Xpress. As a result, Greene's rig careened down an embankment and landed upside down in the grass. He remained pinned inside the crushed cab for about three hours until he was cut from the vehicle and transported to a North Carolina medical center. Greene suffered cuts and lacerations over much of his upper body and was diagnosed as having a fractured left scapula and a fractured left wrist. After an overnight hospital stay, Greene was transported to Louisiana to recover.

Greene was treated by two doctors in Louisiana. Dr. Harold Stokes (hereinafter

---

1. Senior Judge Lewis G. Paisley sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

2. Greene testified he completed employee orientation four separate times.

"Dr. Stokes"), a hand surgeon, provided treatment for Greene's wrists, forearms, hands and elbows. At the first appointment in June 2003 Greene's chief complaints were a chip in his left wrist, a fracture of his left scapula, pain in his left wrist and arm, and numbness and tingling in the left long, ring and small fingers. Concern about the distal ulna and the distal radioulnar joint was also mentioned. Upon completing a physical therapy and strengthening regimen Greene enjoyed full range of motion in his forearms, elbows and wrists. In releasing Greene to return to work without restriction as of September 15, 2003, Dr. Stokes opined, "I will see him back as needed. I do not anticipate any permanent partial impairment related to his wrists or hands."

Dr. John Cazale (hereinafter "Dr. Cazale"), an orthopedic surgeon, treated Greene's complaints of bilateral shoulder pain. At Greene's first appointment in July 2003 he exhibited a full range of motion with his right shoulder and nearly a full range of motion with his left. By August 15, 2003, an MRI scan of his right shoulder revealed no significant abnormality and Dr. Cazale deemed it "completely normal." The MRI scan of Greene's left shoulder showed no rotator cuff tear and no anatomic lesions. Some arthritis was noted but not attributed to the collision. Dr. Cazale prescribed Vioxx as an anti-inflammatory and ordered supervised physical therapy to improve Greene's shoulder strength. By September 23, 2003, an MRI scan of the left shoulder showed only "some mild degenerative joint disease in his AC joint." On October 23, 2003, Dr. Cazale ordered more physical therapy believing Greene would reach maximum medical improvement (hereinaf-

ter "MMI") within four to six weeks and could return to work as a trucker.

A week later, Dr. Gordon Nutik (hereinafter "Dr. Nutik") performed an independent medical evaluation (hereinafter "IME") at the request of PTL's workers' compensation insurance carrier.[3] Dr. Nutik's examination of Greene's neck revealed normal cervical lordosis. While there was pain about the muscles adjacent to the base of his neck on palpation, there was no pain about the cervical spine or the sternomastoid muscle. There was also no spasm of Greene's neck muscles. Indeed, Greene's neck motion was normal and his cervical compression tests were negative. Dr. Cazale concurred with Dr. Nutik's recommendation of a four-week conditioning program for Greene. Like Dr. Cazale, Dr. Nutik expected Greene to reach MMI upon completion of the physical therapy and conditioning program.

On November 11, 2003, Dr. Cazale wrote, "I don't anticipate any sequela secondary to his injury as far as his shoulders are concerned. Again, his physical examination reveals a normal neurological exam." When Dr. Cazale last saw Greene on December 16, 2003, his examination revealed "some crepitance with range of motion in shoulders" and "discomfort with cold with the extremes of weather." Dr. Cazale noted Greene's physical therapy and functional capacity evaluation indicated Greene could return to work as a trucker. Indeed, when Greene's physical therapy ceased in December 2003 his therapist opined, "All goals are achieved." Dr. Cazale discharged Greene to return to work with no restrictions as of January 5, 2004.

---

**3.** American Casualty Company of Reading is PTL's Kentucky workers' compensation insurance carrier. CNA/ClaimPlus (hereinafter "CNA") is the third-party administrator for American Casualty Company. Francesca Clayton (hereinafter "Clayton") is the CNA Recovery Specialist who handled Greene's case.

None of the doctors who treated or evaluated Greene in the six months following the collision saw him after he was released to return to work. Greene testified that in July 2004 he passed a physical exam needed to maintain his commercial driver's license (hereinafter "CDL"), but no records from that exam were introduced into the record. The only medical treatment Greene has received since being released to return to work occurred on November 11, 2004. On that date he went to a Louisiana emergency room to have glass removed from his hand. Glass from the shattered windshield of the cab continues to erupt from his skin and requires occasional removal. Greene is not taking prescription medication but he does take over-the-counter painkillers.

Greene did not see another doctor until August 2005 when Dr. Emily Rayes–Prince (hereinafter "Dr. Rayes–Prince") performed an IME at the request of Greene's workers' compensation attorney. After reviewing medical records and examining Greene, she diagnosed him as having "chronic neck pain with left arm radicular pain; post traumatic tension migraine headaches; S/P [sic] left ulnar styloid fracture; and s/p left scapula fracture with residual shoulder crepitus and scapula dyskinesis." Citing the American Medical Association *Guides to Evaluation of Permanent Impairment* (hereinafter "*Guides*"), she assessed Greene with a 7% Diagnosis–Related Estimate Cervical Category II (hereinafter "DRE") whole person impairment rating which she attributed to the collision. Despite the rating, Dr. Rayes–Prince believed Greene could return to work as a trucker. In explaining her assessment she opined in pertinent part, "Mr. Greene has neck pain and left arm radicular complaints without objective findings."

PTL voluntarily paid Greene $18,693.64 in temporary total disability (hereinafter "TTD") benefits for the period of May 21, 2003, through January 14, 2004. PTL also paid Greene's medical expenses in the amount of $24,444.80. Because Greene's workers' compensation file was already closed when Greene went to the emergency room for removal of glass from his hand in November 2004, PTL refused to pay the charges associated with that procedure.

Although Greene was released by Dr. Cazale to resume driving a truck as of January 5, 2004, he did not. He chose instead to remain in Louisiana and work as a millwright at the Folger's Coffee plant in New Orleans. In July 2004 he returned to PTL and resumed driving a truck but voluntarily left just three months later. While he considered himself physically capable of driving a semi, Greene feared driving on snow and ice during the approaching winter months.

Between January and August 2005 Greene worked steadily as a millwright, most recently as night foreman of an eleven-person mechanical maintenance crew. During his deposition, Greene acknowledged some work at the plant was "very heavy" but explained that as a supervisor he now engages in very little manual labor and uses a golf cart to traverse the facility which is about a dozen blocks long and three or four blocks wide. At the final hearing in December 2005 Greene testified he still had pain, "especially in cool, damp weather, through my shoulder, up through the back of my neck, and I still have pretty frequent headaches."

Greene retained Hon. Richard J. Smith (hereinafter "Smith"), an attorney practicing in Spartanburg, South Carolina, to pursue a third-party tort action against U.S. Xpress and Maddox for causing the accident in North Carolina. Smith notified CNA of Greene's intention to file a civil

suit and in July 2004 Clayton asserted a subrogation lien on behalf of PTL for $43,138.44.[4] Clayton's letter cited the North Carolina Workers' Compensation Act as authority for the lien.[5] On August 23, 2004, Smith offered PTL a lump sum payment of $20,000.00 plus a "clincher document" to be signed by Greene releasing PTL from any and all future workers' compensation claims stemming from the collision. PTL apparently had no interest in the clincher document and pressed instead for the full amount of the lien.

On September 14, 2004, without filing suit, Smith negotiated a $150,000.00 compromise settlement between Greene, U.S. Xpress and Maddox. As part of the settlement signed that day, Greene released U.S. Xpress and Maddox from all claims arising from the collision and agreed in pertinent part:

> to reimburse and indemnify all released parties for any amounts which any insurance carriers, government entities, hospitals or other persons or organizations may recover from them in reimbursement and indemnity for amounts paid to me/us or on my/our behalf as a result of this accident by way of contribution, subrogation, indemnity or otherwise.

On September 14, 2004, Smith advised Clayton of the compromise settlement of Greene's tort action against U.S. Xpress and Maddox. Smith also confirmed a second agreement, this time between Greene and PTL, for $29,450.66 (plus a portion of two additional medical bills) in full satisfaction of the original $43,138.44 subrogation claim. Smith drafted the release under which PTL would receive two-thirds of the lien amount and Greene would keep the remaining third as PTL's share of the attorney fees "pursuant to the North Carolina statute." PTL also paid one-half of the costs incurred in the tort settlement which amounted to less than $100.00. On September 28, 2004, Smith forwarded a check to Clayton for $28,665.99. On November 12, 2005, Smith forwarded two additional checks, one for $314.02 and another for $465.65, to Clayton.[6] Thus, of the $150,000.00 personal injury settlement Smith had negotiated with U.S. Xpress and Maddox, Greene ultimately received a total of $70,367.41.

Greene applied for Kentucky workers' compensation benefits in May 2005. In his Form 101, Greene claimed the work-related collision of May 20, 2003, had resulted in numerous injuries, including "multiple cuts & bruises, fractured scapula, sprained

---

4. According to Clayton's letter of July 16, 2004, this amount represented $24,444.80 in paid medical expenses and $18,693.64 in TTD benefits.

5. Although Greene signed a document at the time he was hired by PTL agreeing that any workers' compensation claim would be resolved under Kentucky law, the subrogation lien between Greene and PTL was settled under North Carolina law. Kentucky Revised Statutes (KRS) 342.700 requires all legal fees expended by an employee in pursuit of a tort recovery from a third party to be paid from any subrogation lien recovery due the employer. Under North Carolina law, however, the employer is responsible for only one-third of the employee's legal fees. North Carolina General Statutes Annotated (N.C.G.S.A.) § 97–10.2. The reason Greene and PTL applied North Carolina law, in contravention of the document signed by Greene at the time of hire by PTL, is unclear from the record. Under KRS 342.700, PTL's entire subrogation lien would have been negated because the lien amount ($43,138.44) was less than the legal fee ($50,000.00) charged by Smith.

6. Three checks were sent because there were two outstanding medical bills from Greene's treatment in North Carolina immediately after the collision. The amount of these bills was known but payment had not been made to the providers when the agreement was signed.

1 ankle, chipped part of bone of 1 wrist, deep tissue/soft tissue muscle damage of upper torso." Greene did not mention any neck injury.

Five issues were submitted to the ALJ for resolution: (1) was Greene entitled to permanent partial disability (hereinafter "PPD")[7] benefits; (2) did the bargain Smith negotiated with Clayton, whereby PTL agreed to accept only two-thirds of its full subrogation lien, result in PTL being overpaid since Kentucky law requires an employer to pay an injured worker's entire legal fee and expenses for pursuing a civil action and Greene paid his attorney more than the amount of PTL's lien; (3) must PTL pay for a November 2004 emergency room visit for the removal of glass from Greene's hand; (4) did Greene suffer an "injury" as that term is defined under the Kentucky Workers' Compensation Act; and (5) is Greene entitled to future medical benefits of his injuries where both treating doctors released him to return to work without restriction and neither anticipated the need for future medical care. The ALJ convened a final hearing on December 14, 2005. In addition to Greene's live testimony at the hearing and a transcript of Greene's earlier deposition, other items before the ALJ included: Greene's medical records from Drs. Stokes, Cazale, Nutik and Rayes–Prince; medical records from Greene's hospitalization in North Carolina immediately after the collision; Greene's physical therapy records; his work and salary history; documentation of TTD benefits paid to Greene by PTL for the period of May 21, 2003, through January 14, 2004; Greene's medical bills paid by PTL; the compromise settlement Smith negotiated on behalf of Greene with U.S. Xpress and Maddox to conclude the tort action; correspondence between Smith and Clayton documenting the negotiations that resulted in PTL accepting a reduced amount in full satisfaction of its subrogation lien; and the briefs submitted by counsel.

The ALJ's opinion was issued on February 10, 2006. The ALJ found Greene had suffered an "injury" as defined in KRS 342.0011(1)[8] because the collision that fractured Greene's left wrist and left scapula and caused numerous cuts and lacerations about his upper body was a traumatic event. However, the ALJ dismissed Greene's claim for PPD benefits since none of the three doctors who treated or evaluated Greene during the six months immediately following the collision had assessed any functional impairment rating in accordance with the *Guides* or had imposed any permanent work restrictions. The ALJ noted that Dr. Rayes–Prince's IME was performed on August 26, 2005, more than two years after the collision, and that her assessment of an impairment rating arose with regard to Greene's cervical condition without objective findings. The ALJ further noted none of the treating doctors had ever diagnosed Greene with a work-related cervical condition. Since Greene's cervical complaints did not surface until late in 2005, the ALJ found the medical opinions of Drs. Stokes, Cazale and Nutik to be more persuasive. Thus,

7. KRS 342.0011(11)(b) defines "permanent partial disability" as "the condition of an employee who, due to an injury, has a permanent disability rating but retains the ability to work[.]"

8. KRS 342.0011(1) defines an "injury" as "any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings." The term "injury" does not include "the effects of the natural aging process[.]"

the ALJ was unconvinced Greene had suffered any PPD as a result of the collision.

The ALJ found PTL liable for Greene's November 2004 trip to the emergency room for the removal of glass from his hand since the glass had become embedded when the windshield shattered during the collision. He further found PTL liable for any future medical expenses incurred for the removal of any additional embedded glass. The ALJ denied Greene's claim for any other future medical benefits citing: both Drs. Stokes and Cazale released Greene to return to work without any restrictions; Greene was not currently under a doctor's care; Greene had not seen a doctor because of the collision since being released to return to work in January 2005; and, Greene had not sought prescription medication and only occasionally resorted to treating himself with over-the-counter pain pills.

Finally, claiming a lack of jurisdiction, the ALJ declined to review the negotiated settlement reached between Greene's attorney and PTL to satisfy the subrogation lien. By characterizing this agreement as part of the tort recovery rather than a subrogation issue, the ALJ found it to be outside his delegated statutory authority under KRS Chapter 342. Thus, he did not address whether the agreement should have been submitted for approval as required by KRS 342.265, nor did he consider whether PTL should have recovered any portion of its subrogation lien. Even so, the ALJ did find that Greene's civil tort attorney negotiated the signed agreement with PTL's insurance carrier; that as a result of those negotiations the carrier reduced its actual lien amount by one-third to offset Greene's legal fees and paid one-half of the costs expended in reaching the agreement; that the civil action had been "litigated" [9] in North Carolina rather than Kentucky; and that the agreement had been reached in good faith.

Dissatisfied with the ALJ's opinion, Greene filed a petition for reconsideration. First, Greene argued the ALJ had jurisdiction to review the alleged mistaken overpayment on the subrogation lien under *Whittaker v. Hardin*, 32 S.W.3d 497 (Ky. 2000). He asserted the ALJ had erred by failing to make a specific finding on whether the agreement between Greene and PTL would "pass muster" under KRS 342.265 [10] since it was never submitted to the ALJ for approval as required by that statute. Second, Greene argued the ALJ had erred in finding that the subrogation agreement had been negotiated in good faith. He noted that the subrogation agreement had been based in significant part upon an application of North Carolina law even though PTL had required Greene to sign papers at the time of hire agreeing that Kentucky law would apply to any work-related injury. Third, Greene argued the ALJ had erred in restricting PTL's liability for future medical expenses to the removal of embedded glass since undisputed medical evidence had established that Greene had suffered two fractures in the collision and no doctor had ever expressly opined that those fractures,

---

**9.** This is a factual misstatement. Smith negotiated the tort settlement on behalf of Greene against U.S. Xpress and Maddox without filing suit. There was no litigation. Further, the terms of the compromise settlement are not in dispute.

**10.** KRS 342.265(1) reads in pertinent part: "If the employee and employer and special fund or any of them reach an agreement conforming to the provisions of this chapter in regard to compensation, a memorandum of the agreement signed by the parties or their representatives shall be filed with the executive director, and, if approved by an administrative law judge, shall be enforceable pursuant to KRS 342.305."

although healed, would require no future care. Furthermore, Greene asserted that Dr. Rayes–Prince's diagnosis of a work-related cervical condition and her recommendation for an MRI scan to determine the extent of the untreated injury were uncontroverted.

In opposing the petition for reconsideration, PTL argued Greene was simply repeating his previously asserted unpersuasive arguments and asking the ALJ to save him from the poor bargain his own civil tort attorney had negotiated on his behalf. PTL further argued the ALJ's denial of future medical expenses was correct because the medical records and reports of Drs. Stokes, Cazale and Nutik provided support for his finding that Greene had returned to his pre-injury health status and would not reasonably be expected to require further medical treatment apart from the occasional removal of embedded glass.

Upon denial of the petition for reconsideration, Greene appealed to the Board which affirmed the ALJ on all issues. This appeal followed.

## I. THE SUBROGATION LIEN AGREEMENT BETWEEN GREENE AND PTL

■ Greene's first contention is that since the agreement he reached with PTL sought to resolve the Kentucky workers' compensation subrogation lien the ALJ obviously had jurisdiction to review its terms

and wrongly declined to do so. In response, PTL argues that Greene is really asking the ALJ to relieve him from the terms of a bad bargain negotiated by his civil tort attorney.[11]

■ As a reviewing court, we give great deference to the Board's decision. However, we must intervene when the Board "overlook[s] or misconstrue[s] controlling statutes or precedent, or commit[s] an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hospital v. Kelly,* 827 S.W.2d 685, 687–88 (Ky.1992). From our reading of the Kentucky Workers' Compensation Act, and specifically KRS 342.265 and 342.700(1), we agree with Greene. PTL cannot reasonably claim ignorance of the statutory requirement that any agreement relating to compensation be submitted to an ALJ for approval under Kentucky workers' compensation law since PTL, itself, made Greene's acceptance of such applicable law a condition of employment. Nor can PTL now reasonably claim prejudice by being held accountable to the clear mandates of the statutory law it chose to apply. The ALJ was authorized to review the parties' subrogation lien and was required to do so. For the reasons explained below, we vacate and remand this issue to the Board for further proceedings consistent with this opinion.

In its opinion, the Board correctly recognizes PTL had a statutory right to subrogation under KRS 342.700(1)[12] because

11. In its brief to the Board, PTL argued the ALJ's opinion should not be read as saying he lacked jurisdiction to review the agreement between Greene and PTL. Instead, PTL characterized the ALJ's words as a "disinclination to disturb the agreement reached by the parties."

12. The relevant statutory language in KRS 342.700(1) reads, "If compensation is awarded under this chapter, the employer, his insurance carrier, the special fund, and the uninsured employer's fund, or any of them, having paid the compensation or having become liable therefor, may recover in his or its own name or that of the injured employee from the other person in whom legal liability for damages exists, not to exceed the indemnity paid and payable to the injured employee, *less the employee's legal fees and expense."* (Emphasis added).

the collision that injured its employee was caused by the negligence of U.S. Xpress and its driver, Maddox. However, it is what the Board said next that we find troubling. In reaching its conclusion the Board wrote,

> ... tort damages awarded for lost earning capacity or medical expenses, while subject to statutory subrogation, nonetheless remain tort damages paid outside the domain of the Workers' Compensation Act. The jurisdiction of administrative agencies, such as the Office of Workers' Claims and the Workers' Compensation Board, extend only to those matters that are delegated to them by the legislature. *Custard Ins. Adjusters, Inc. v. Aldridge,* 57 S.W.3d 284 (Ky.2001). In situations where a fact finder in the civil action has not decided allocation of tort damages, an ALJ, as the fact finder in the workers' compensation case, may make such findings, but only for purposes of determining an employer's statutory subrogation credit and its effect, if any, on payment of workers' compensation benefits. *Whittaker v. Hardin,* 32 S.W.3d 497 (Ky.2000). The ALJ, however, lacks any discretion to decide matters concerning the resolution of the third-party tort action, including the approval of settlements made between two or more parties as participants in that action.

> Where the corresponding tort claim is resolved through settlement, the signed agreement or release represents a contract reached between the injured employee, employer or workers' compensation insurer with the tortfeasor. Other than for purposes of establishing the parameters of the subrogation credit so as to preclude double recovery, the tort settlement has no effect whatsoever on the relationship or obligations that exist between either the employer or its carri-er and the injured worker whose claim is the subject of a workers' compensation proceeding. Hence, the amount of recovery collected from a third-party tortfeasor, whether by verdict or settlement, is solely a matter within the jurisdiction of the courts and beyond the scope of authority of an ALJ and this Board.

In line with this reasoning, we must conclude that the settlement for $29,450.66 in full satisfaction of the American Casualty's workers' compensation lien of $43,138.44 was not subject to ALJ approval pursuant to KRS 342.265(1). Greene, in the release provided to Maddox and U.S. Xpress, in exchange for $150,000.00, agreed "to reimburse and indemnify all released parties for any amounts which any insurance carriers, government entities, hospitals or other persons or organizations may recover from them in reimbursement for amounts paid to me/us or on my/our behalf as a result of this accident by way of contribution, subrogation, indemnity or otherwise." In so doing, he assumed any liability the third-party tortfeasors owed PTL and American Casualty. Consequently, the subsequent agreement reached by the petitioner with American Casualty constituted part of the resolution of Greene's North Carolina tort action against U.S. Xpress and Maddox, and not part of his workers' compensation claim filed later in Kentucky. The fact that Greene, in hindsight, entered into a bad bargain using a significant portion of his tort damages to satisfy a subrogation credit that would have ultimately been consumed entirely by the attorney fee paid to his North Carolina lawyers does not now confer jurisdiction upon the ALJ in his Kentucky workers' compensation case to either approve or rescind the agreement. *See*

*AIK Selective Self–Insurance Fund v. Minton*, 192 S.W.3d 415 (Ky.2006); *AIK Selective Self Insurance Fund v. Bush*, [74 S.W.3d 251 (Ky.2002)]. That is precisely what the ALJ ruled below. Hence, we find no error.

While individual statements within the Board's opinion are accurate, we cannot accept the Board's analysis and ultimate conclusion.

 We agree with the Board's opening premise that tort damages paid by a tortfeasor to an employee, employer or employer's carrier are paid outside the Workers' Compensation Act and only a court may review them. However, we do not agree that the use of tort recovery funds to pay an employer's subrogation lien somehow converts questions about the amount of subrogation due the employer into part and parcel of the tort claim. Nor do we agree that an employee and his employer's workers' compensation carrier, simply by reaching a settlement, can transform a subrogation issue that would normally be within the jurisdiction of an ALJ into a tort issue that can only be reviewed by a trial court. Under the present circumstances, we cannot envision a scenario in which a court would exercise jurisdiction over the workers' compensation subrogation issues posed by Greene. In light of Kentucky's statutory scheme, it is wholly appropriate that the ALJ review the terms of the agreement between Greene and PTL's carrier.

KRS 342.325 plainly states, "[a]ll questions arising under this chapter, if not settled by agreement of the parties interested therein, with the approval of the administrative law judge, *shall be* determined by the administrative law judge except as otherwise provided in this chap-

ter." (Emphasis added). The ALJ is the ultimate arbiter when it comes to resolving workers' compensation subrogation issues. Thus, parties have two options. Either they settle the matter betwixt themselves and submit a signed agreement to the ALJ for approval,[13] or the ALJ will resolve the matter for them. Either way, the ALJ is charged with ensuring the terms of the workers' compensation subrogation are statutorily correct. Hence, while parties may bargain with one another, and even make bad bargains, they must still adhere to the statutory scheme set forth in KRS Chapter 342.

Our reading of KRS 342.325 is consistent with *Whittaker v. Hardin, supra*, 32 S.W.3d at 499, wherein our Supreme Court states in pertinent part, "The right to subrogation credit in a workers' compensation case is purely statutory. *See* KRS 342.700. Thus, because the statutory right to subrogation falls within the workers' compensation chapter, then by definition, the administrative law judge has jurisdiction to resolve any subrogation issues." Applying KRS 342.325 to the matter at hand, the ALJ was authorized to determine whether PTL was responsible for paying all of Greene's legal fees or just a portion of them prior to being entitled to reimbursement of its subrogation lien and whether the parties' settlement agreement incorrectly resulted in Greene overpaying PTL. Thus, the ALJ erred in declining to exercise jurisdiction and the Board erroneously affirmed that decision.

We recognize tort recovery is an issue for the courts and workers' compensation subrogation recovery is a matter for the ALJ. We also agree with the Board that the tort settlement reached on behalf of

---

**13.** No Form 110, Agreement as to Compensation and Order, was ever filed by the parties with the Office of Workers' Claims.

Greene with U.S. Xpress and Maddox was not reviewable by the ALJ. However, in the case before us there are no complaints concerning the terms of the tort settlement and the ALJ was never asked to review that document. In the case *sub judice*, the ALJ was asked to review a second, separate agreement made between Greene and PTL's insurance carrier, the sole purpose of which was to specify how much reimbursement, if any, PTL would recover on its workers' compensation subrogation lien. While PTL's *opportunity to recover* its subrogation lien exists because Greene, through counsel, successfully negotiated a compromise settlement with negligent third-party tortfeasors, PTL's *right to recover* its subrogation lien is "purely statutory" and therefore the ALJ should have reviewed the subrogation overpayment claim. *Whittaker, supra.*

The Board held the subrogation lien agreement did not require approval by the ALJ as discussed in KRS 342.265(1) because in the tort settlement with U.S. Xpress and Maddox, Greene accepted personal responsibility for any subrogation lien owed to PTL or its carrier. While this release extinguished any future financial responsibility for U.S. Xpress and Maddox stemming from the collision, it did not transform PTL's statutory right to subrogation into part of the already concluded tort recovery. Once the civil tort claim was over, Greene's attorney focused on settling the subrogation agreement with PTL's workers' compensation carrier. It is this second agreement that should have been, but was not, submitted to the ALJ for approval under KRS 342.265. Perhaps if the agreement had been submitted to the ALJ for review prior to Greene making the alleged overpayment about which he complains today, the rationale for applying Kentucky law some of the time and North Carolina law the rest of the time, in clear contravention of the employment agreement, would have been discovered, questioned and addressed.

■■ The Board's attitude seems to be that Greene, with the assistance of counsel, made a bad bargain and it is not the role of the ALJ to review the bargain he made. We cannot disagree more. An ALJ is not a rubber stamp, nor is he a "potted plant."[14] It would appear to us that the ALJ, when conducting a statutorily-mandated review of a subrogation agreement, must serve as a check and balance to the often disproportionate power of the parties and insurance carriers. The ALJ can and should disapprove any agreement submitted for review that does not comport with the beneficent purpose of the Workers' Compensation Act. It is the ALJ's duty to ensure that an employee's "right to receive a maximum recovery under the statute must take priority over the right of the employer/insurer to receive reimbursement for the benefits which it was already obligated to pay by contract." *Minton, supra* at 419.

Twice the ALJ said he did not have jurisdiction to review the workers' compensation subrogation agreement and the Board agreed. PTL urged the Board to interpret the ALJ's unambiguous denial of jurisdiction as really meaning he doubted an ALJ should disturb a bargain struck between an employer and an injured employee who was represented by counsel during negotiations. However, close inspection of the precise words chosen twice by the ALJ reveals no support for PTL's contention.

■■ PTL also suggested Greene was simply asking the ALJ to relieve him of a

---

14. Statement by Hon. Brendan V. Sullivan during his defense of United States Marines Lieutenant Colonel Oliver North following the Iran–Contra Affair.

bad bargain. This caused us to wonder whether an employee and his employer, or his employer's carrier, could defeat the safeguards incorporated into the Kentucky Workers' Compensation Act by striking a bargain, signing it, not submitting it to an ALJ for statutorily mandated review, and then fulfilling its terms by sending checks to the employer. We found the answer in *Williams v. Eastern Coal Corp.*, 952 S.W.2d 696 (Ky.1997), and hereby hold parties to a subrogation agreement cannot by agreement defeat the mandatory language of the act. As the Supreme Court of Kentucky explained in *Williams, supra* at 698,

> [w]orkers' compensation is but one part of an overall system of wage-loss protection, the purpose of which is to be certain that income is available to provide the necessities of life for those affected by physical disability, economic unemployment, or old age.... Workers' compensation is a creature of statute, and the remedies and procedures described therein are exclusive. *Morrison v. Carbide and Carbon Chemicals Corp.*, 278 Ky. 746, 129 S.W.2d 547, 549 (1939). When an employer and employee submit themselves to the provisions of the act, their rights and liabilities are henceforth to be measured by the terms of the act. *Id.* at 550. A right created by statute cannot be defeated by the application of a common law principle. *Eversole v. Eversole*, 169 Ky. 793, 185 S.W. 487, 488 (1916). Thus, any analysis of a workers'

compensation issue is necessarily an exercise in statutory interpretation.

Greene and PTL submitted themselves to the terms of the Kentucky Workers' Compensation Act, therefore they are bound by its requirements, including mandatory ALJ approval of any subrogation settlement agreement.

■■■ That Greene reached an agreement with PTL concerning its workers' compensation subrogation lien is undisputed. While PTL would have us hold the agreement did not pertain to "compensation," [15] it clearly did. The sole purpose of the agreement was to specify how much PTL would be reimbursed, if at all, under its subrogation lien for paid medical and TTD benefits. Pursuant to *Skaggs. v. Wood Mosaic Corp.*, 428 S.W.2d 617, 619 (1968) [16], "[i]f an agreement is reached in regard to compensation, a memorandum of it must be filed." [17] *See also Continental General Tire v. Looper*, 211 S.W.3d 78, 80 (Ky.App.2006) ("ALJ's informed approval was necessary to give effect to the agreement between counsel in Looper's case"). Once filed, an agreement must be reviewed by the ALJ and either rescinded or approved. KRS 342.265. Here, the agreement, though finalized in 2004, never came before the ALJ until Greene's workers' compensation claim was filed in 2005. At that point Greene had already paid PTL and the ALJ declined to review the agreement, characterizing it as part of the tort recovery rather than a subrogation issue.

---

**15.** KRS 342.0011(14) defines "compensation" as "all payments made under the provisions of this chapter representing the sum of income benefits and medical and related benefits."

**16.** The question addressed in *Skaggs*, was whether an agreement was ever reached where the employer sent checks to the injured worker and the employee cashed them but there was no formal written acceptance of the settlement for the ALJ to review. Citing *Wil-*

*son v. SKW Alloys, Inc.*, 893 S.W.2d 800, 802 (Ky.App.1995), the court said the term "agreement" should be construed liberally to give effect to the statute.

**17.** Greene's appellate counsel states that Smith suggested submitting the agreement for approval. However, our search of the record reveals no written evidence of such a suggestion.

As stated in *Skaggs, supra,* "[t]he plain purpose of the statute is that the board be given the opportunity to pass upon the terms of compensation settlements, and thus protect the interests of the workmen."

In light of the foregoing, we hold an ALJ has jurisdiction and a statutory mandate to review an agreement reached between an injured employee and his employer or his employer's carrier that purports to determine how much reimbursement, if any, is due an employer or its insurance carrier relative to a workers' compensation subrogation lien. Because the Board has misconstrued controlling law, we must intervene. Therefore, we vacate that portion of the Board's opinion pertaining to the ALJ's lack of jurisdiction over the subject subrogation lien and remand this matter to the Board for it to direct the ALJ to exercise jurisdiction under KRS 342.325 and 342.700 and review the agreement reached between Greene and PTL. The ALJ shall make findings on whether the agreement comports with the provisions of the Kentucky Workers' Compensation Act and whether Greene is entitled to reimbursement from PTL for any overpayment of its subrogation lien.

## II. THE IMPAIRMENT RATING

Greene's second contention is that the ALJ erred by awarding no PPD benefits because the 7% impairment rating [18] assessed by Dr. Rayes–Prince under the *Guides* was uncontradicted. While it is true that Dr. Rayes–Prince was the only doctor to reference the *Guides,* PTL argues the ALJ correctly dismissed Greene's claim for PPD benefits because the trio of doctors who treated and evaluated Greene in closest proximity to the work-related collision unanimously concluded he did not retain any permanent functional impairment.

Greene bore the burden of proof and the risk of nonpersuasion in establishing every element of his claim for PPD benefits. *Burton v. Foster Wheeler Corp.,* 72 S.W.3d 925, 929 (Ky.2002). Thus, he had to establish three elements to be entitled to PPD benefits resulting from the May 2003 collision, including: a statutory injury; an impairment rating pursuant to the *Guides;* and the ability to work, albeit with restrictions. KRS 342.0011(11)(b). Greene failed to meet his burden as the proof demonstrated he could return to his former work as an over-the-road trucker without any restrictions.

Because Greene failed to convince the ALJ that he sustained any PPD as a result of the work-related collision of May 20, 2003, on appeal he must demonstrate evidence "so overwhelming, upon consideration of the entire record, as to have compelled a finding in his favor." *Wolf Creek Collieries v. Crum,* 673 S.W.2d 735, 736 (Ky.App.1984). Evidence that would compel a finding in his favor is that which is "so overwhelming that no reasonable person could reach the [same] conclusion[.]" *REO Mechanical v. Barnes,* 691 S.W.2d 224, 226 (Ky.App.1985). However, as the ALJ's findings are supported by the reports of Drs. Stokes, Cazale and Nutik, the record before us does not compel a different result. Therefore, Greene has failed to demonstrate the Board "overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice" and we will not intervene with regard to this issue. *Western Baptist Hosp. v. Kelly, supra* at 687–88.

---

18. Permanent income benefits cannot be awarded absent an impairment rating based upon the most recent *Guides.* KRS 342.0011(11)(b).

■ The medical evidence in this case reflected two differing views. When "medical evidence is conflicting, the question of which evidence to believe is the exclusive province of the ALJ." *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993). The three doctors who treated and evaluated Greene between June 2003 and December 2003 focused on injuries to his hands and shoulders with most of the complaints being concentrated on the left side. Following completion of a regimen of physical therapy, strengthening and conditioning, Drs. Cazale and Stokes released Greene to return to work without restriction. Neither Dr. Stokes nor Dr. Cazale anticipated the need for future treatment. Dr. Nutik, the IME requested by PTL's carrier, agreed and believed Greene would reach MMI in November 2003. At the conclusion of his treatment, Greene's physical therapist noted, "[a]ll goals are achieved." Based upon this medical evidence the ALJ found Greene had suffered no PPD.

It is significant that Greene failed to report any complaints of neck pain to Drs. Stokes, Cazale or Nutik who provided treatment and evaluation in the seven months immediately following the collision. In fact, Dr. Nutik's examination specifically indicated Greene's neck was normal as of October 2003. It is also noteworthy that Greene listed no neck injury when he filed his claim in May 2005. Indeed, it was not until his IME with Dr. Rayes–Prince in August 2005 that she diagnosed Greene with "chronic neck pain with left arm radicular pain" based on his medical history and evaluation, and assessed a 7% cervical impairment rating based upon the *Guides*, "without objective findings." Certainly, the ALJ was "not constricted to a myopic view" of Dr. Rayes–Prince's diagnosis and assessment of Greene's cervical condition when her medical opinions, established so long after the work-related collision, were

essentially based on Greene's history. *Osborne v. Pepsi–Cola*, 816 S.W.2d 643 (Ky. 1991). Here, the ALJ's findings were adequately supported with facts from the record so as to deal fairly with both sides and to properly apprise them of the basis for the decision. *Shields v. Pittsburgh and Midway Coal Min. Co.*, 634 S.W.2d 440, 444 (Ky.App.1982).

■ Thus, we disagree with Greene's suggestion that once a physician assesses an impairment rating the ALJ must accept it as true. We ascribe no magical conclusiveness to the assessment of an impairment rating *vis-a-vis* the overriding weight of the remaining evidence. An impairment rating is but one piece of the total evidence that the ALJ, as factfinder, must evaluate for "quality, character, and substance" and, in the exercise of his discretion, either accept or reject. *Burton, supra* at 929. Greene cites us to *Mengel v. Hawaiian–Tropic Northwest and Central Distributors, Inc.*, 618 S.W.2d 184, 186 (Ky.App.1981) and *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky.2000). However, we find both cases to be distinguishable. In *Mengel* all the evidence supported a single finding. That is not the scenario in the case before us. Here, the medical evidence and opinions expressed in the records and reports of Drs. Stokes, Cazale and Nutik point toward one conclusion while the medical conclusions of Dr. Rayes–Prince, drawn more than two years later, point toward an opposite result. This is not a case in which an ALJ disregarded an uncontradicted medical opinion in order to draw a different conclusion on his own. *Mengel*, at 186.

Similarly, *Magic Coal Co.* is inapplicable to our facts because its analysis was limited to KRS 342.315(2) which pertains only to occupational disease claims and the requirement that clinical findings and

opinions of university evaluators be given presumptive weight by an ALJ. Indeed, *Magic Coal Co., supra* at 91, specifies, "[t]here is no comparable requirement concerning injury claims[.]" We decline to extend the very specific language of *Magic Coal* to the present case by analogy.

We agree with the Board's conclusion that "the ALJ was free to reject Dr. Rayes–Prince's opinion that Greene's neck pathology was secondary to the accident of May 20, 2003, the doctor's reliance on the AMA *Guides* notwithstanding." Because the medical reports from Drs. Stokes, Cazale and Nutik support the ALJ's finding that Greene is not functionally impaired due to the work-related collision we do not consider the disability rating assessed by Dr. Rayes–Prince to be so overwhelming that no reasonable person could have reached the same conclusion drawn by the ALJ. *REO Mechanical, supra.* Therefore, we affirm.

### III. AWARD OF PARTIAL FUTURE MEDICAL COVERAGE

 Greene's third and final contention is that the ALJ erred by failing to award future medical expenses. Intertwined with this issue is whether KRS 342.020 allows an award of *partial* future medical coverage since the ALJ ordered PTL to pay only for future medical costs associated with the removal of glass from Greene's hand.[19] Greene argues his other work-related injuries, namely a fractured wrist and a fractured scapula, may require future treatment and the ALJ erroneously foreclosed the employer's responsibility for payment of any related medically reasonable and necessary treatment for those conditions under the act.

Greene claims the act does not recognize the award of partial future medical benefits. He asserts that since no doctor has specifically opined his left wrist and left scapula will never need future medical treatment, the ALJ played doctor in drawing that conclusion. On the other hand, PTL argues Greene's injuries were only temporary and since he is now fully recovered, but for the occasional removal of glass, the ALJ properly restricted PTL's financial responsibility to the removal of glass and otherwise dismissed the claim for future medical expenses.

Again, the ALJ enjoys great discretion in considering the weight and credibility of the evidence. *Magic Coal Co. v. Fox, supra* at 96. The evidence establishes Greene suffered a fractured wrist, a fractured scapula and lacerations over much of his body as a result of the collision. After completing a course of physical therapy, strengthening, and work conditioning, his two treating physicians, Drs. Stokes and Cazale, released him to return to work without restriction and neither has seen him since. Dr. Cazale noted some arthritic change in Greene's AC joint and Greene said he experienced some discomfort in extremely cold weather, but otherwise he enjoyed a full range of motion on both his right and left sides and his MRI scans were normal. Dr. Cazale predicted Greene would reach MMI in November 2003. Neither Dr. Stokes nor Dr. Cazale anticipated Greene would need future medical care as a result of the collision, although Dr. Stokes did say he would see Greene "as needed." On October 30, 2003, a third physician, Dr. Nutik, evaluated Greene's shoulders at the request of CNA. He found no objective clinical findings and,

---

**19.** The ALJ also ordered PTL to pay for the November 11, 2004, removal of glass from Greene's hand.

like Dr. Cazale, anticipated Greene would reach MMI in four weeks. None of these doctors treated Greene's cuts and lacerations.

Both Greene and PTL agree the seminal case is *Robertson v. United Parcel Service*, 64 S.W.3d 284 (Ky.2001). Greene argues the facts of his case are distinguishable while PTL characterizes them as a carbon copy. We agree with PTL. *Robertson* worked for both a masonry company and for UPS. While working at UPS, Robertson claimed he injured his lower back. He missed only a couple days of work at UPS, but missed three months of work from his masonry job. The ALJ found Robertson had shown only a temporary flare-up of a pre-existing, nonwork-related condition and incurred no permanent disability. The Board and this Court affirmed the ALJ's opinion, as did our Supreme Court, because there was "substantial evidence that the claimant sustained no permanent disability as a result of the work-related injury and that a different finding was not compelled." *Robertson, supra* at 287 (citing *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky.1986)). More specifically, the Supreme Court held:

> In other words, the ALJ concluded that the claimant suffered a work-related injury but that its effect was only transient. It resulted in no permanent disability or change in the claimant's pre-existing spondylolisthesis. Thus, the claimant was not entitled to income benefits for permanent, partial disability or entitled to future medical expenses, but he was entitled to be compensated for the medical expenses that were incurred in treating the temporary flare-up of symptoms that resulted from the incident.

*Id.* at 286.

In the case now before us, the evidence is uncontroverted that Greene's wrist and scapula were fractured during the work-related collision. However, over the course of his treatment he regained a full range of motion in both wrists and both shoulders, his test results were normal, and he was released to return to work without any restrictions. Based upon these facts, there was substantial evidence to support the ALJ's conclusion that Greene did not suffer a permanent disability because of the work-related collision. Therefore, under *Robertson*, no award for future medical expense was compelled, other than for the removal of glass, which represents an ongoing sequela of the work-related injury.

We see nothing within the Workers' Compensation Act, or case law to which we have been cited, prohibiting an ALJ from granting future medical expenses for a specific work-related injury to the exclusion of others. Here, windshield glass was embedded in Greene's body as a result of the work-related collision and would occasionally erupt through his skin. Thus, it was entirely proper for the ALJ to award future medical expenses reasonably and necessarily incurred for the removal of glass extruding from Greene's skin. However, using the *Robertson* analysis, the ALJ did not err in denying future medical expenses for Greene's fractured wrist and fractured scapula since substantial medical evidence indicated these injuries had fully healed, their disabling effects were purely transient, and future medical treatment was unforeseen by treating physicians. Under these supporting facts, the ALJ reasonably concluded Greene had not sustained any additional work-related injuries reasonably expected to require future medical treatment. Thus, a contrary finding is not compelled and we affirm the ALJ's restriction of future medical damages to those related to the removal of glass.

For the foregoing reasons, we affirm in part, vacate in part and remand to the Board for further proceedings consistent with this opinion.

ALL CONCUR.